1  S. ZANE ROTHSCHILD SBN: 45859
   1551 S. La Cienega Blvd.
2  Los Angeles, California, 90035
   (310) 837-0801
3  Cell (310) 710-5377
   zane@zane-law.com
4  Attorney for Plaintiff,
   THE O-MEGA NETWORK, INC.
5

6

7              UNITED STATES DISTRICT COURT
8             CENTRAL DISTRICT OF CALIFORNIA
9

10 THE O-MEGA NETWORK, INC.,      )
   a California corporation,      )    Case No. 2:18-CV-04968-JAK-KS
11                                )    REDACTED
                                  )
12              Plaintiffs,       )    FIRST AMENDED COMPLAINT FOR
13                                )    DECLARATORY JUDGMENT
                                  )    OF NON-INFRINGEMENT
14                                )    OF TRADEMARKS
15                                )    DEMAND FOR JURY TRIAL
16                                )
                                  )
17                                )
          vs.                     )
18                                )
19

20

21 OMEGA (OMEGA SA) (OMEGA AG)    )
22 (OMEGA LTD.)                   )
                                  )
23                                )
24              Defendants.       )
25 _____ )

26              APPENDIX TO THE MOVING PAPER
27        "REDLINE" VERSION SECOND AMENDED COMPLAINT

28
              FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 1

15 USC § 1051 et seq. (the Trademark Act), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act); and separately, Diversity Jurisdiction.

**INTRODUCTION**

**PRELIMINARY STATEMENT:**

For its complaint, Plaintiff, THE O-MEGA NETWORK, INC., a California corporation (hereinafter referred to as "Plaintiff"), by and through its attorney, S. Zane Rothschild, avers as follows and files this complaint for Declaratory Judgment against the Defendant, OMEGA (OMEGA SA) (OMEGA AG) (OMEGA LTD.), (hereinafter, "Defendant"), to present issues and proof in this case.

Plaintiff, THE O-MEGA NETWORK, INC., brings this lawsuit, for, among other issues, to bring a halt to the Defendant's acts of Trademark "bullying" and its Opposition to the Registration of Plaintiff's Mark; AND its spurious claim to ownership of the symbol, "Ω", which is in the Public Domain, and other clearly false allegations. This is an action by Plaintiff for Declaratory Relief and Declarations that Plaintiff's Mark and activities do not violate Defendant's rights; and for Plaintiff's Mark to be allowed to be registered in the principal register, Serial No. 86-466,947, in International

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 2

Category Class 13, registering for stun guns, only, nothing else and adopted, formally.  That the use of its "Ω-MEGA" Trademark, consisting of "Ω-MEGA" stylized, and the omega symbol "Ω" is in the shape of an omega and a pulse symbol within a circle: Plaintiff seeks registration of its Mark, in the principal register, Serial No. 86-466,947, in International Category Class 13, registering for stun guns, only, nothing else.  That the use of its Mark, consisting of a stylized, omega symbol "Ω", and above it a pulse symbol within a circle, filled with dark, crisscrossed lines, see Plaintiff's Exhibit 2), is lawful. And Plaintiff seeks damages, especially for Defendant's bullying, and its foreseeable consequences.  Plaintiff has four (4) styles of stun guns.  The goods are intended for self-defense and/or animal control.  International Category Class 13 is the International Trademarks category designation for firearms and fireworks etc. Declarations that Plaintiff's Mark does not infringe upon the rights of Defendant, or any other designation in which Defendant claims rights.  Specifically, Plaintiff has four (4) styles of stun guns.  The goods are intended for

self-defense and/or animal control.   International Category
Class 13 is the International Trademarks category
designation for firearms and fireworks etc.   Plaintiff's Mark
does not infringe upon the rights of Defendant, or any other
designation in which Defendant claims rights.

<u>JURISDICTION AND VENUE:</u>

     This Honorable Court has original jurisdiction over the
subject matter of this action pursuant to 28 U.S. Code § 1331
and 1338 (Federal question) that involves 28 U.S.C. § 1338(a)
(Trademarks), the Trademark Laws of the United States, 15 USC §
1051 et seq. (the "Trademark Act), 28 U.S.C. § 2201 (Declaratory
Judgment Act), and separately, Diversity Jurisdiction, as the
Defendant's hub for all its serious decisions is in Switzerland
and is a Swiss Corporation, though it does business nationwide,
including in this judicial districts in Los Angeles.

     This is an action for Declaratory Judgment arising under
the Trademark Laws of the United States, 15 USC § 1051 et seq.
(the Trademark Act); and the Declaratory Judgment Act,
Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202;
Federal Rules of Civil Procedure, Rule 57.


<u>DEFENDANT:</u>

     This Court has personal jurisdiction over Defendant, and

Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(c). Defendant has a presence in the State of California and within the Central District. On information and belief, Defendant regularly and continuously transacts business, including regularly soliciting business in California and supplying products to California consumers; making contracts within California and advertising the sale of its products, especially its expensive watches, through the Internet and other sources, to California residents. On information and belief, Defendant is a Swiss Corporation, its business address is 96 Rue Jacob Stampfli, Biel/Bbienne 2502, Switzerland, a corporation duly organized and existing under the laws of Switzerland, with a principal place of business in Switzerland. Jurisdiction over Defendant, and venue is proper in this district pursuant to 28 U.S.C. §1391(b), and 28 U.S.C. §1391((c), diversity of citizenship, defendant being a Swiss corporation.

**PLAINTIFF:**

The events giving rise to Plaintiff's claims have a substantial effect in this district, where a substantial part of the events or omissions giving rise to Plaintiff's claim occurred. Plaintiff conducts most of its business in and around Los Angeles, California, and is incorporated as a California corporation, its home office is in Los Angeles, California, 90035.

**ACTUAL CASE OR CONTROVERSY HAS ARISEN BETWEEN THE PARTIES:**

Defendant has opposed Plaintiff's application for registration of its Trademark, hereafter, "Mark". Defendant, OMEGA, hereinafter, "Defendant", has filed an Amended Opposition an Amended Opposition (PLAINTIFF'S EXHIBIT NO. 1) to to the registration of Plaintiff's Mark on November 28, 2014, with the TRADEMARK TRIAL AND APPEAL BOARD, asserting, by inference, asserting, by its accusations that Plaintiff infringed on its Mark. "to cause confusion, or to completely appropriated Defendant's entire Mark.  Plaintiff finds itself in the terrible position of having to decide whether to submit to Defendant's threats, and likely go broke, or to fight this powerful Defendant, with the hope of getting help?  Submitting would mean, enormous costs, to make new molds for its products, costs to re-design its boxes and literature and the costs of suit. All these things would be so costly, that Plaintiff would have to close its business.  Plaintiff is just surviving financially.  Its gross revenues in 2016 were approximately $175,000.00, with a loss of $-33,000.00; a one-man company, with no other employees.  Should

Plaintiff have to risk losing everything?  But the notice of opposition certainly invokes the language of trademark infringement and dilution, clearly makes claims of trademark infringement and dilution[1], for which Plaintiff then had a reasonable apprehension that Defendant, would sue Plaintiff.  Acknowledging, however, that the reasonable apprehension test has been expanded by MedImmune.  ("the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").  In MedImmune's wake, courts have increasingly found actionable controversies on the theory that: "[W]here a trademark holder asserts rights . . . based on certain identified ongoing or planned activity of another party, and where that party contends it has the right to engage in the accused activity without a license, an Article III case or controversy will arise and the party need not risk a

---

[1] Defendant's contention No. 14, Page 52
On information and belief, the Applicant's Mark is likely to diminish and dilute the value and distinctive character of Opposer's famous OMEGA Marks, thus damaging Opposer.

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 7**

suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights." The opposition has certainly "invoked the language of trademark infringement and dilution which could give Plaintiff a reasonable apprehension that Defendant would sue Plaintiff if Plaintiff continues to use its . . . . mark."[1] Plaintiff has a reasonable apprehension and belief, after receiving Defendant's demands, that Defendant would sue Plaintiff. EnviroGLAS Prods., Inc. v. EnviroGLAS Prods., LLC, 705 F. Supp. 2d 560, 567 (N.D. Tex. 2010). In the instant case, Plaintiff has ongoing business activities, and contends it has the right to engage in the those activities. Certainly, an Article III case or controversy. "Accordingly—and without addressing the issue of how the pleading requirements of §§ 2(d) and 13 of the Lanham Act can be satisfied without using "the language of trademark infringement and dilution"—the court concluded that a sufficient controversy existed to allow it to exercise jurisdiction over the matter." Neilmed Prods., Inc., ibid.

---

[1] Neilmed Prods., Inc. v. Med-Sys., Inc., 472 F. Supp. 2d 1178 (N.D. Cal. 2007)

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**        **Page 8**

In Plaintiff's attorney's first discussions with Defendant's first attorney, Jeffrey A. Lindenbaum Esq., Mr. Lindenbaum demanded, that Plaintiff must remove its Mark from all its product, packaging, literature, and advertising.  Subsequently, settlement discussions, somewhat optimistic[1], began and continued, with Mr. Lindenbaum, for many months, there were many stipulated continuances before the TTAB.  Defendant then changed counsel, and the new counsel, Marie Anne Mastrovito, after many settlement attempts by Plaintiff, Defendant rejected all Plaintiff's offers of settlement. Defendant's filed opposition with the TTAB clearly "invokes the language of "trademark infringement" and "dilution" which gives Plaintiff a threat that Defendant would sue Plaintiff, if Plaintiff continues

---

[1]  Zane,
 You should not anticipate a rejection – I think something can likely be worked out in this case.  I have not yet heard back from Omega, but it often takes them a long time to work a settlement proposal through the legal department, and then up the chain to management for approval.
If you like, I can file for another suspension (60 days) of the Opposition for purposes of settlement.
I will not address your possible DJ action here, other than to say that Omega reserves all rights to challenge such a filing.
Regards,
Jeff

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 9

to use its mark[1], and continue its business activities. "Accordingly and without addressing the issue of how the pleading requirements of §§ 2(d) and 13 of the Lanham Act can be satisfied without using "the language of trademark infringement and dilution"—"the court concluded that a sufficient controversy existed to allow it to exercise jurisdiction over the matter." NEILMED PRODUCTS, INC., v. MED-SYSTEMS, INC., No. C 06-00964 CW., United States District Court, N.D. California. January 10, 2007.

   Furthermore, Plaintiff, was required, after being presented with Defendant's Opposition and threat of suit, to retain an attorney, to file a response to Defendant's accusations, to have settlement discussions, and expend significant expenditures of attorney time, effort, and costs, which are crippling damages to a one (1) man business, or submit to Defendant's threats, and be forced out of business. Plaintiff has been injured, and harmed, in fact, by

---

[1] Neilmed Prods., Inc. v. Med-Sys., Inc., 472 F. Supp. 2d 1178 (N.D. Cal. 2007)

retaining counsel and paying for filing of this matter, and suffering the threat of being forced out of business.

company, with no employees.  Exactly, the very small company, in which a Trademark bully tries to force compliance with its demands.  Were Plaintiff comply, it mean going out of business.  It is only because the Plaintiff's CEO's was able to get the help of an attorney, could he contest Defendant's allegations and behavior.  Otherwise, they would have succeeded.

Plaintiff's in its an offer to settle, (footnote 2, page 7), offered to be allowed to co-exist with Defendant, but limit its Mark to only its current stun gun models; Defendant rejected this offer of settlement.  Plaintiff also offered to amend its mark, and this was also rejected. (Defendant's refusal to Plaintiff's counter offer).  Next came another of Defendant's rejections of Plaintiff's offer of settlement[1].  Subsequently, on June 5, 2018 Defendant's

---

[1] **Dear Zane:**
 I have received further instructions from my client.

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**          Page 11

1   attorney, MARIE ANNE MASTROVITO, rejected all offers

2   Defendant claims that they have valid Trademark and that

3   Plaintiff is in violation of its Trademark.

4   SETTLEMENT OFFERS:

5        Plaintiff has offered to settle this matter, several times,

6   7   but Defendant has refused[1], initially, Plaintiff, through his

8   counsel, S. Zane Rothschild, was told that Defendant demanded

9

---

They have indicated that they are willing to agree to the withdrawal of your
client's application without prejudice provided that your client agrees that
it will not file for the mark O-MEGA (or phonetic equivalents) for the same
goods in the future and will also discontinue use of the mark O-MEGA.
We look forward to your response.
Sincerely,
Marie Anne Mastrovito
ABELMAN FRAYNE & SCHWAB
666 Third Avenue
New York, New York 10017
Direct Telephone: (212) 885-9248


[1] Your counter offer is simply not acceptable to my client
Omega SA is only willing to withdraw the Opposition if The O-Mega Network
agrees that it will not use or seek to register any mark containing O-MEGA
(or any phonetic equivalent in the future. . . .

Dear Marie Anne Mastrovito:
I am in receipt of your offer of settlement.
In response, I offer the following counter offer:
Your Client will Consent to my Client Amending his Mark, or withdrawing his
application, without penalty, and my Client would then submit a new
application for "O-MEGA STUN GUNS"; each Party will bare all their own
costs: My client will agree to either submit an amendment to our current
Mark, using a Roman "O" then, "O-MEGA STUN GUNS", if that amendment is
accepted; or a stipulation to withdraw our application, without penalty; my
Client would then submit a new application for
"O-MEGA STUN GUNS", and your client would not object to that Mark.
My Client will agree to not use the name O-MEGA on any products other than
STUN GUNS, for example never on watches, clothing, timing devices, firearms,
etc. or any similar products.
HOWEVER, he shall not change the name on any or his four (4) STUN GUN
products, currently being sold; he will agree not to use this name on any
future products.
My Client will keep his current web site, "omegastunguns.com";
My Client will keep Client's corporate name: "THE O-MEGA NETWORK, INC.". . .

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF         Page 12

that Plaintiff remove its Mark, expressly demanding

discontinuance of its use from all its products and advertising.

He inferred that Defendant would sue Plaintiff, if Plaintiff

refused to comply.  This presents a reasonable belief and

apprehension of litigation.

Plaintiff's in its first offer to settle, (footnote 2, page

7), offered to be allowed to co-exist with Defendant, but limit

its Mark to only its current stun gun models; Defendant rejected

this offer of settlement.  Plaintiff then offered to amend its

mark, and this was also rejected. (Defendant's refusal to

Plaintiff's counter offer).  Next came Defendant's written offer

of settlement[1] (rather than their oral offers of settlement).

Plaintiff's first offer of settlement[2] is footnoted here.  On

June 5, 2018 Defendant's attorney rejected all offers.

---

.

[1] Dear Zane:
 I have received further instructions from my client.
 They have indicated that they are willing to agree to the withdrawal of your
client's application without prejudice provided that your client agrees that
it will not file for the mark O-MEGA (or phonetic equivalents) for the same
goods in the future and will also discontinue use of the mark O-MEGA.
We look forward to your response.
Sincerely,
Marie Anne Mastrovito
ABELMAN FRAYNE & SCHWAB
666 Third Avenue
New York, New York 10017
Direct Telephone: (212) 885-9248


[2] Dear M. MASTROVITO:
I am in receipt of your offer of settlement.
In response, I offer the following counter offer:

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 13

1

2      Plaintiff faces an imminent threat of loss; his entire

3  livelihood is at stake, a real and immediate threat of injury.

4  Defendant's threat of litigation unless Plaintiff agrees to give

5  up its Trademark presents a real and substantial controversy,

6  between the parties[1], as discussed in "MedImmune".  Plaintiff

7  currently produces the products that are accused of

8

9  You Client will Consent to my Client Amending his Mark; each Party will bare
   their all their own costs.

10 My client would agree to either submit an amendment to our current Mark,
   using a Roman "O" then, "O-MEGA STUN GUNS", if it would be accepted; or a
   stipulation to withdraw our application, without penalty; my Client would

11 then submit a new application for
   O-MEGA STUN GUNS, and your client would not object to that Mark.

12 My Client would further agree to change the name on his products within four
   (4) years of this agreement; the time for compliance would be 4 years.  My

13 Client believe the the costs associated with re-tooling, and reprinting will
   be very costly.  Perhaps your client would consider contributing?

14 My Client would keep his current web sites with his current name; be allowed
   to keep his domain name, as well as his current name on all indexes;

15 be allowed to maintain Client's same corporate name;
   be allowed to attach labels saying "O-MEGA is now: "O-MEGA STUN GUNS".

16 My client hopes this counter offer is acceptable!
   My client believes that he in no way interferes or competes with your client,

17 and your client suffers no loss from his existence.
   For your information, my client is also my son; who in my expert opinion

18 would be an incredible witness before a Federal jury.
   His corporation is a one-man business doing less than $300,000.00 per year.

19 I believe this is a very fair offer of settlement.
   S. Zane Rothschild, Esq. I thank you in advance for all you professionalism

20 and courtesy.
   Very sincerely yours,S. ZANE ROTHSCHILD, ESQ.

21 Attorney for THE O-MEGA NETWORK, INC.
   P.S.:  What about letting my client use his pending mark, under a fifty (50)

22 year License from your client; at a fee of one dollar ($1.00).  Your client
   preserves his legal position in regard to protecting his mark.

23 My tiny, non competitive Client, who is not in same market or market places,
   and has no confusing similarities; and clearly has not and cannot do any harm

24 to your client, would be allowed to continue his small business without
   interference.

25 After fifty (50) years, it is stipulated each party preserves all their
   rights and remedies; and settlement discussions are to continue.

26

27

28 [1] MedImmune, Inc. v. Genetech, Inc., 549 U.S. 118, 127 S, Ct, 764, 166 L.
   Ed.604 (2007)

                    FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 14

infringement; and has produced said products for thirty four (34) years.

Defendant's action have directly harmed the plaintiff in violation of its rights. The apprehension that Defendant would sue Plaintiff, if Plaintiff continues to use its Mark presents a substantial, definite, and concrete controversy, between parties, who have adverse legal interests.

Plaintiff has a real and reasonable apprehension of being subjected to liability, if he continues to sell his goods, a "real and reasonable apprehension that he will be subject to liability.[1]' As expressed in _Societe de Conditionnement en Aluminium, 655 F.2d at 944_. If the plaintiff is engaged in the ongoing use of the allegedly infringing trademark, the showing of apprehension "need not be substantial."[2] "Also, the fact that Plaintiffs use of the allegedly infringing mark is ongoing actually makes the burden of showing apprehension lower."

The Defendant threatens plaintiff's very business

---

[1] " Chesebrough-Pond's v. Faberge, 666 F.2d 393, 396 (9th Cir.1982) (quoting Societe de Conditionnement en Aluminium v. Hunter Engineering Co., 655 F.2d 938, 944 (9th Cir.1981)).

[2] Societe de Conditionnement en Aluminium, 655 F.2d at 944.

existence.  Plaintiff currently sells its products, which are marked with Plaintiff's Mark.  These present and past activities, manufacturing, selling, and marketing products, that allegedly infringed the trademark at issue.  All these activities, prior to seeking declaratory relief.  These activities may constitute infringement, and then, would likely, be followed by a lawsuit, unless Plaintiff gets protection, and is allowed to operate free from threats, which could cause its destruction.

Plaintiff's very business existence is threatened by the Defendant.  Plaintiff currently sells its products, which are marked with Plaintiff's Mark.  This present activity, manufacturing, selling, and marketing products that allegedly infringed the trademark at issue, prior to seeking declaratory relief.  This may indeed constitute infringement, followed by a lawsuit, if Plaintiff does not get protection from and operate free from threats, which could cause its destruction.  Should Plaintiff have to risk losing everything, before the Court offers its protection?  Defendant's actions have directly harmed the plaintiff in violation of its rights.

The apprehension that Defendant would sue Plaintiff, if
Plaintiff continues to use its Mark presents a
substantial, definite, and concrete controversy,
between parties, who have adverse legal interests.

Plaintiff has a real and reasonable apprehension of
being subjected to liability, if it continues to sell
its goods, a "real and reasonable apprehension that he
will be subject to liability.[1]' As expressed in <u>Societe
de Conditionnement en Aluminium, 655 F.2d at 944.</u>   If
the plaintiff is engaged in the ongoing use of the
allegedly infringing trademark, the showing of
apprehension "need not be substantial."[2]  "Also, the
fact that Plaintiffs use of the allegedly infringing
mark is ongoing actually makes the burden of showing
apprehension lower."

The Defendant threatens plaintiff's very business
existence.  Plaintiff currently sells its products,
which are marked with Plaintiff's Mark.  These present

---

[1] " Chesebrough-Pond's v. Faberge, 666 F.2d 393, 396 (9th Cir.1982)
(quoting Societe de Conditionnement en Aluminium v. Hunter Engineering
Co., 655 F.2d 938, 944 (9th Cir.1981)).

[2] Societe de Conditionnement en Aluminium, 655 F.2d at 944.

and past activities, manufacturing, selling, and
marketing products, that allegedly infringed the
trademark at issue.  All these activities, prior to
seeking declaratory relief.  These activities may
constitute infringement, and then, would likely, be
followed by a lawsuit, unless Plaintiff gets
protection, and is allowed to operate free from
threats, which could cause its destruction.

Defendant has acted in bad faith and with base conduct.
Trying to force Plaintiff to submit by use of its superior
economic strength, and trying to gain a monopolistic right,
expanding trademark protection to a vulgar degree.
monopolistic rights, expanding trademark protection to
an unreasonable degree.  Please note, the Defendant
alleges that they own the rights to the symbol for omega, which
is in public domain; a monopoly on all commercial use of a
letter from the Greek alphabet.  Professor McCarthy, infra, "To
me, that would expand Trademark law beyond all reasonable
bounds."  The Court also may wish to consider that Defendant has
filed numerous oppositions to others wishing to register their
mark. Continuing to make it more difficult and costly for
smaller businesses and organizations to obtain the benefits and

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 18

legal presumptions that stem from federal registration of their marks. **Defendant has filed numerous oppositions to others wishing to register their mark. Continuing to make it more difficult and costly for smaller businesses and organizations to obtain the benefits and legal presumptions that stem from federal registration of their marks."**

There presently exists a "justiciable controversy"[1] regarding the Plaintiff's right to register its Trademark, free of any allegations by Defendant, and free of any threats of suit and/or liability to the Plaintiff; by finding that Plaintiff's conduct and/or Mark does not constitute an infringement of any Trademark allegedly owned by Defendant; allegations of diminished value, or any other claims related to Defendant's brand. **nor allegations of diminished value, or any other claims related to Defendant's brand.**

Plaintiff seeks relief from this honorable Court.

---

[1] As noted in Chesebrough—Pond's, Inc. v. Faberge, Inc., 666 F.2d 393, 396 (9th Cir.1982); and also: J. Thomas McCarthy, Trademarks and Unfair Competition § 32.51 (4th ed.2007) ("an actual controversy or threat of infringement does not have to be said in so many words. It can be expressed in the attitude of the defendant as expressed, for example, in 'circumspect language in a letter.")

**FACTUAL BACKGROUND:**

On the basis of information and belief, Defendant primarily uses its OMEGA Mark in connection with luxury watches, whose prices range from approximately $2,000 to $280,000.  On information and belief, although Defendant has been in operation since 1894, it has only recently begun targeting the United States with its marketing efforts.

Defendant's Trademarks are listed for the following products: starting guns, life vests, jewelry, leather goods, key chains, money clips, fragrances, caps, eyewear, wallets, organizer agenda, writing instruments, writing pads, games, bags, and golfing equipment.

Plaintiff holds itself out as a manufacturer of stun guns[1] for self-defense and/or animal control.  Plaintiff seeks Class registration of its Mark, Serial No. 86-466,947[2] in International Category 13, for: stun guns, only, nothing else.  Plaintiff's

---

1 "Stun Gun" a hand held weapon that releases an electric charge or a tranquilizer dart to immobilize a person or animal. [1965—70] Random House Kernerman Webster's College Dictionary, © 2010 K Dictionaries Ltd. Copyright 2005, 1997, 1991 by Random House, Inc. All rights reserved.

2 Mark:

O-MEGA

application for Trademark, **Plaintiff's application for Trademark, (EXHIBIT NO. 2),**is for stun guns only.  Plaintiff has not used or applied to register its Mark in connection with watches, clocks, or timing devices, etc.  Category 13 is the International Trademarks designation for firearms, ammunition, projectiles, explosives, and fireworks, Plaintiff's correct category.

   Plaintiff is, and at all relevant times hereto has been, in the business of marketing and selling certain stun gun products, Angeles, California, 90035.

**INTENT:**

   On or about July 1985, S. Zane Rothschild ("Rothschild") and his, now deceased, partner, Kenneth Rich ("Rich"), were

---



| | US Serial Number: |
|---|---|
| 86466947 | |
| | Application Filing Date: |
| Nov. 28, 2014 | |
| | Filed as TEAS Plus: |
| Yes | |
| | Currently TEAS Plus: |
| Yes | |
| | Register: |
| Principal | |

discussing what kind of business they should go into.  While
Rothschild was reading the Los Angeles Daily Journal, he saw an
ad for an item called "stun-guns".  Rothschild was a Star Trek
fan.  After some discussion with Rich, they decided to purchase
some stun guns to see if they were good, marketable products for
them to begin a business.  Rothschild and Rich ("Partners") did
indeed purchase some stun guns.  After checking with various law
enforcement agencies, e.g., the Los Angeles Police

Department, the California Attorney General's office, the
D.A.'s office in Los Angeles, etc., After checking with
various law enforcement agencies, e.g., the Los Angeles
Police
Department, the California Attorney General's office,
the D.A.'s office in Los Angeles, and trademark data
bases, etc.they found that this item was legal to sell in the
State of California.  The Partners ultimately purchased a
minimum order of stun guns.  The Partners then set out to
develop a strategy for selling these stun guns.

Later, in 1986, the company was incorporated as a
California corporation.  Virtually all of the Plaintiff's
business is done at gun shows, two or three gun store retailers,
and Internet purchasers, The purchasers of stun guns, are

knowledgeable purchasers, and inspect the product,

carefully, before purchasing.  The Plaintiff's products

are four (4) hand-held stun guns, two (2) that have a

rectangular shape, and two (2) 18" stick stun guns,

items that have become known generically as stun guns.

all of whom inspect the product, carefully, before purchasing.

Furthermore, on the product itself, there is clear

labeling of the O-MEGA name in a manner which would

avoid any possibility of confusion by consumers, since

the labeling is clear and prominent and shows the name

of the source for all to see.

PLAINTIFF'S PRODUCTS:{tc "THE PRODUCT"}

The Plaintiff's products are four (4) hand-held stun guns,

two (2) that have a rectangular shape, and two (2) 18" stick

stun guns, items that have become known generically as stun

guns.

At all times, it should be clearly noted, Plaintiff's

products are clearly marked and packaged, and that the boxing

portion of its packaging is clearly different and not in the

least similar to any packaging of the Defendant's products.

Furthermore, on the product itself, there is clear labeling of

the Ω-MEGA name in a manner which would avoid any possibility of

confusion by consumers, since the labeling is clear and
prominent and shows the name of the source for all to see.

NAMING THE PRODUCTS:

Plaintiff, by its predecessor founders, decided on
a name for their products.  Plaintiff, predecessor
founders, chose their Mark to signify that this was the
last word in self-defense.  Omega is the 24th and last
letter of the Greek alphabet, the extreme or final
part, the end.  Plaintiff's, predecessor founders, did
use the omega symbol as the first letter of their
product and corporate name, to identify Plaintiff's
products with use of electricity for self-defense.

Plaintiff decided on a name for their products. Plaintiff
chose their Mark to signify that this was the last word in
self-defense; omega is the 24th and last letter of the Greek,
the extreme or final part, the end.  Plaintiff did use the omega
first letter of their product and corporate name, the to
identify Plaintiff's products with use of electricity for self-
defense; furthermore, Plaintiff's Mark has a very distinctive
pulse symbol within a circle, indicating an electronic product;
the omega symbol was also meant to approximate the sound of the
Hindu holy word, Ohm, then the hyphen and the word "MEGA".

Kenny Rich, the former partner, was a practicing Hindu and wanted a double-entendre for its meaning; using the hyphen[1], he thought, would separate the syllables, allowing for the pronunciation of the omega sound.  The word omega has also taken on other religious significance as well, as a reference to "the end" of time, or the end of life or combat. See Id. Exs. 833-835, 855-874.  Furthermore, Plaintiff's Mark has a very distinctive pulse symbol within a circle, indicating an electronic product; the omega symbol was also meant to approximate the sound of the Hindu holy word, Ohm, then the hyphen and the word "MEGA".  Kenny Rich, the former partners, now deceased, was a practicing Hindu and wanted a double-entendre for its meaning; using the hyphen[1], he thought, would separate the syllables, allowing for the pronunciation of the omega sound.  The word omega has also taken on other religious significance as well, as a reference to "the end" of time, or the end of life or combat. See Id. Exs. 833-835, 855-874.

Plaintiff's Mark is exclusively in connection with stun guns.  Specifically, Plaintiff has four (4) styles of stun guns,

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 25

supra.

Plaintiff rejects and disputes Defendant's filed opposition contentions, 1-14, for which it has sufficient information, however, when it does not have sufficient knowledge or information to form a belief as to the allegations contained therein, prior to discovery, then, accordingly, Plaintiff denies those allegation. Hereafter, Plaintiff's answers, with arguments, infra.

DEFENDANT'S FILED OPPOSITION CONTENTIONS, 1-14:

(PART OF THE BASIS OF THE CONTROVERSY) and

PLAINTIFF'S ANSWERS, WITH ARGUMENTS (here and infra).

Hereinafter, in Defendant's Opposition, Plaintiff has substituted the word "Defendant" for the words "Opposer" and "OMEGA".  In Plaintiff's answers to Defendant's contentions, Plaintiff has substituted the word "Plaintiff" for the word for Applicant.

Defendant's contention No. 1

1.  Defendant's contends that the Plaintiff,

THE O-MEGA NETWORK, INC. (stun guns), is

engaged in the sale and Marketing of similar

and highly related goods and services to those

of defendant.

Answer to No. 1

Defendant seems to be using "boiler plate"

allegations against Plaintiff.  It is their right; of

course, to plead everything they consider a relevant

factor for judgment.  Alas, it lacks real credibility.

Plaintiff sells and markets only its four (4) models of

stun guns.  It is clear that stun guns are not similar

nor related in any way to Defendant's goods, on the

basis of information and belief, especially their

dominant product, watches; and Plaintiff does not

market or sell timepieces, jewelry, sports timing

products, clothing, accessories, or sports promotion.

All the items listed in their Opposition, and their

designation for Trademark protection, under their

Applications, namely: categories 009 and 014 do not

include Plaintiff's products, explained in more detail,

infrā.  Plaintiff does not market any watches.  On

information and belief, Defendant does not market or

sell any stun guns.

`

Defendant's contention No. 2

Defendant has been engaged in the sale and

Marketing of goods under the registered

Trademark Ω and OMEGA, since at least as early

as 1894.

Answer to No. 2

On the basis of information and belief, although

Defendant has allegedly been in operation since 1894,

it has only recently begun targeting the United States

with its marketing efforts.

Plaintiff challenges Defendant's claim of Trademark

for Ω, which Plaintiff argues, in greater detail,

infrā, footnotes beginning on Page 5, in answer to No.

4.

Defendant's contention No. 3

Opposer is the owner of the following U.S.

Trademark application: OMEGA (AND DESIGN) and
OMEGA symbol Ω.

Answer to No. 3

Plaintiff challenges Defendant's claim of a
Trademark for the symbol Ω; Plaintiff argues, infra,
beginning on Page 5, in answer to No. 4 and footnote on
pages 8-9.

Defendant's contention No. 4

Opposer is the owner of common law rights, and
numerous other valid subsisting registrations
for the OMEGA and OMEGA symbol Ω (collectively
referred to as the OMEGA Marks). Defendant has
used its OMEGA Marks from a date prior to
Plaintiff's use or constructive use dated.

Answer to No. 4

"Common law rights exist by virtue of use of the
Mark in connection with specific goods and services and
exist independent of registration rights. Opposer must
prove that it has priority with respect to any
unregistered rights by a preponderance of the

evidence." See Hydro-Dynamics Inc. v. George Putnam & Co., Inc., 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987). In order to establish common law rights, the evidence must be clear and specific. See Nat'l Bank Book Co. v. Leather Crafted Prods., Inc., 218 USPQ 826, 828 (TTAB 1993); HD. Lee Co. v. Maidenform Inc., 87 USPQ2d 1715, 1722- 23 (TTAB 2008); in this case it is not specific as to the similarity of the goods.

Additionally, Plaintiff did not willfully trade on the Defendant's goodwill, if any, in using its Mark. Plaintiff's goods are sold and marketed in totally different channels than Defendant. The question is, what are the normal channels of trade for stun guns, and whether those can be presumed to be the same channels of trade for watches and/or computer or automated apparatuses for determining time and distance. Defendant cannot show any overlap with any of its claimed common law rights, because these items are sold and marketed in totally different channels.

Professor McCarthy[1], "The common law will extend that protection, however, only in geographic or product Markets in which the firm actually is doing business or into which it would naturally expand."  Not so in this case.

Additionally, Defendant cannot claim common law rights in this symbol, Ω that is in the public domain. Plaintiff asks that this Honorable Court take Judicial Notice[2], that the symbol Ω (omega), supra, is in the public domain, and to attribute that evidentiary fact, as a presumption.  Defendant seems to equate its alleged Trademark with the monopolistic rights that usurp and enlarge its intended protection.  The omega symbol has older roots than the Defendant's claim: The Apostle John wrote of Jesus' saying, "I am the Alpha and the Omega, the first and the last, the beginning

---

[1] Judge Thomas McCarthy is a nationally renowned authority on Trademarks and unfair competition and on the rights of publicity. He is a Senior Professor of Law at the University of San Francisco.  Mr. McCarthy is the author of the well-known seven-volume treatise, *McCarthy on Trademarks and Unfair Competition* (published by Thomson-Reuters-West), which has been relied upon as authority in over 3,500 judicial opinions.

[2] Federal Rule of Evidence 201(d) which, provides that "[a] court shall take judicial notice if requested by a party and supplied with the necessary information."

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 31

and the end" (Rev 22:13) and writing about Jesus'
eternality, John wrote that Jesus said, "I am the Alpha
and the Omega," says the Lord God, "who is and who was
and who is to come, the Almighty." (Rev 1:8).  The term
"OMEGA" is not a coined brand name, but instead it is a
Greek word, that is commonly known and seen, and on the
basis of information and belief, used throughout the
United States by many others related to Defendant's
Mark.  The word, OMEGA, on the basis of information and
belief, is commonly used by fraternities and sororities
on college campuses and by hundreds of businesses and
individuals as Trademarks and service Marks.  On the
basis of information and belief, there are more than
131 live registrations for identical or highly similar
Marks, many of which are currently in use and some of
which are used in connection with apparel, sporting
equipment, and even timing devices.  and wouldn't Mr.
King be surprised if his OMEGA XL, wasn't actually than
more famous than Defendant's Mark.

   Defendant failed to allege likelihood of confusion

based on use in connection with any goods other than
Classes 009 and 014, timepieces, jewelry, sports timing
products, clothing, accessories, and sports promotion;
all the items listed in their Opposition, and their
designation for Trademark protection, under their
Applications.  Defendant alleges that likelihood of
confusion is based on Defendant's registration in
International Classes 009 and 014, namely, automated
recording machines and computer apparatuses for
measuring time and distance.  Defendant can provides no
evidence to support the  claim likelihood of confusion.
A good standard for judging whether there exists a
likelihood of confusions, would be: "whether there
exists a 'likelihood that an appreciable number of
ordinarily prudent purchasers [will] be misled, or
indeed simply confused, as to the source of the goods
in question.'" Thompson Medical Co., Inc. v. Pfizer
Inc., 753 F.2d 208, 213 (2d Cir. 1985), citing Mushroom
Makers, Inc. v. R.G. Barry Corp., 560 F.2d 44, 47 (2d
Cir. 1978). "To support a finding of infringement,

there must be a probability of confusion, not a mere possibility." _Playtex Products, Inc. v. Georgia-Pacific Corp._, 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation marks and citation omitted).   Defendant did not allege likelihood of confusion with goods in any other class or any other specific goods, including rights at common law and registrations for watches, watch accessories, and other horological or chronometric instruments.  Consequently, Defendant has failed to make these goods at issue, and any evidence related to a likelihood of confusion with anything other than Defendant's timing apparatuses is irrelevant and should be excluded under _Fed. Rule 401_ (Rule 401 — Test for Relevant Evidence), See _Pep Boys, 94 USPQ at 159; FF Acquisition LLC, 93 USPQ2d at 2031-32._.

Defendant's contention No. 5

Defendant has used its OMEGA Marks in commerce extensively and has acquired a considerable and valuable goodwill and wide scale recognition for its Mark.  The public has come to associate

OMEGA and the OMEGA symbol "Ω" Marks, with the
Defendant and Defendant's goods and services.
The public has come to associate Defendant's
goods and services, which include not only
watches and sports timing products, but
clothing, accessories, and other goods and
services, including retail services, sports
sponsorships and sporting goods relating to
sports sponsorships.

Answer to No. 5

Defendant alleges that, "The public has come to
associate OMEGA and the OMEGA symbol "Ω" Marks", with
the Defendant and Defendant's goods and services.
Counsel for Plaintiff personally associates the word
OMEGA with: Omega-3 Fish Oil,
the Greek alphabet letter, "Ω", and numerous other
omega products, etc.  Surely, Larry King, As Brand
Ambassador Omega XL would disagree, believing all his
advertising makes OMEGA XL, more well known than
Defendant's Mark.  As explained in answer to No. 4,

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 35

Page 20, supra, the public has probably come to equate the symbol "Ω" with many more identities than only that of the Defendant's (see footnotes on pages 6-7).

Plaintiff never contemplated Defendant's Mark while creating their Mark; did not willfully trade on the Defendant's goodwill in using its Mark, and certainly never fraudulently designed its Mark. Plaintiff has never taken or acquired any of Defendant's alleged goodwill; Plaintiff did not willfully trade on the plaintiff's goodwill in using its Mark; therefore, if no goodwill has been taken, then no action should lie; a rule that the common law; for example, in the 1742 case of Blanchard v. Hill, 2 "Lord Hardwicke, expressing a fear of monopoly, refused an injunction to prevent one maker of playing cards from stamping upon its cards the same symbol used by another maker to identify its own cards in the Market. No action would lie, Lord Hardwicke explained, unless the manufacturer that copied the other's Mark did so "with a fraudulent design", . . .

Defendant's Notice Of Opposition did not allege use of their Mark on any product other than watches and sports timing products, clothing, accessories, and other goods and services, including retail services, sports sponsorships and sporting goods relating to sports sponsorships.  Not stun guns.  Plaintiff's goods are unrelated and specifically different than watches and timing equipment.

Therefore, on the basis of information and belief, no other product can be or should be considered in this proceeding.  Odom's Tennessee Pride Sausage Inc. v. FF Acquisition LLC, 93 USPQ2d 2030,2031-32 (Fed. Cir. 2010).

Defendant fails to appreciate, as stated supra, beginning on Page 5, in answer to No. 4 and footnote on pages 8-9, that the term "OMEGA" is not a coined brand name, but instead is a Greek letter.

Defendant's contention No. 6

Plaintiff's Mark is confusingly similar to the Defendant's Marks and is likely, when applied

1   to the goods of the Applicant, to cause

2   confusion, or to cause mistake or to or to

3   deceive. 15 U.S.C. § 1052(D).  Plaintiff's Mark

4

5   makes a highly similar commercial impression to

6   Defendant's Marks due to its

7   incorporation of an OMEGA Mark, creating a

8

9   virtually identical sound and appearance.

10  Plaintiff has completely appropriated

11  Defendant's entire Mark.  The overall

12

13  commercial impression of Plaintiff's Mark, when

14  applied to same or similar goods, would cause

15

16  confusion or be likely to cause confusion,

17  mistake, or deception.

18  answer to No. 6

19

20      The "sine qua non" of Trademark infringement, the

21  requisite condition that is indispensable, is a

22  connection between consumer confusion and Plaintiff's

23

24  Mark.  Quoting from Playtex Products, Inc. v. Georgia-

25  Pacific, "whether there exists a 'likelihood that an

26  appreciable number of ordinarily prudent purchasers

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF      Page 38

[will] be misled, or indeed simply confused, as to the source of the goods in question.'" Thompson Medical Co., Inc. v. Pfizer Inc., 753 F.2d 208, 213 (2d Cir. 1985), citing Mushroom Makers, Inc. v. R.G. Barry Corp., 560 F.2d 44, 47 (2d Cir. 1978). "To support a finding of infringement, there must be a probability of confusion, not a mere possibility." Playtex Products, Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation marks and citation omitted).  Here there is none.

THE O-MEGA NETWORK'S use of the O-MEGA mark has not actually caused, and is not likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of either party's mark, goods, or services. The public is not likely to believe, that, THE O-MEGA NETWORK'S INC'S use of the O-MEGA symbol has a tendency to induce the public to believe, that THE O-MEGA NETWORK INC.'S products, stun guns, are provided by, sponsored by, licensed by, affiliated, or associated with, or in some other way legitimately

1  connected to products sold and marketed by Defendant.

2  THE O-MEGA NETWORK INC'S use of the OMEGA symbol has

3  not actually caused, and will not cause, any damage to

4

5  Defendant.

6      There is a lack of any relationship between

7  Defendant's and Plaintiff's goods, their look, sound,

8

9  feel, and their channels of trade or the classes of

10  purchasers, these factors weigh heavily against a

11  finding of likelihood of confusion.

12

13  United States Court of Appeals, Ninth Circuit:  "The

14  test is whether there is a likelihood of confusion

15  resulting from the total effect of the defendant's

16  product and package on the eye and mind of an ordinary

17

18  purchaser[1]".

19

20      To determine the likelihood of consumer confusion,

21  we apply the long-established factors set forth in AMF

22  Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-54 (9th

23

24  Cir.1979).

25

26

27

28
_____
Judge Thomas McCarthy, Trademarks and Unfair Competition, 2Ed.,
Vol. I (1984), Sec. 8:3

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**          **Page 40**

Many Courts have used many of the same factors in this regard.   In, "Alliant case, Omega S.A. (Omega AG) (Omega Ltd.) v. Alliant

Application Serial Nos. 78548473 and 78550543, . . . "Despite the of Opposer's OMEGA Marks for watches, and the similarity of the parties' Marks, we find that confusion is unlikely. There is simply no evidence of any relationship between the goods, which are offered in distinct channels of trade to different classes of purchasers who would not be likely to believe that Applicant's (Plaintiff's) and Opposer's Defendant's goods emanate from the same source.  While the fame of 33 Opposition Nos. 91173785 and 91174067 Opposer's Marks plays a "dominant role" in our analysis, it "cannot overwhelm the other DuPont factors."   The Board found that in view of the "utter lack of any evidence of a relationship between Opposer's (Defendant's) and Applicant's (Plaintiff's) goods, their channels of trade or the classes of purchasers, these factors weigh heavily against a finding of likely

confusion."   The Board also accepted applicant's, (Plaintiff's) argument that its goods would be purchased with care because they are used to protect people's lives. This factor slightly favored applicant,(the Plaintiff).   "In Application of E. I. DuPont DeNemours Co., 476 F.2d 1357,177 USPQ 563 (CCPA 1973), the courts listed thirteen factors that are relevant in a likelihood of confusion analysis. See id. at 1361, 177 USPQ at 567.

The thirteen factors are:

(1) the similarity or dissimilarity of the Marks in there entireties as to appearance, sound, connotation and commercial impression;

(2) the similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior Mark is in use;

(3) the similarity or dissimilarity of established, likely-to-continue trade channels;

(4) the conditions under which and buyers to whom sales

are made, i.e., "impulse" vs. careful, sophisticated

purchasing;

(5) the fame of the prior Mark (sales, advertising,

length of use);

(6) the number and nature of similar Marks in use on

similar goods;

(7) the nature and extent of any actual confusion;

(8) the length of time during and conditions under

which there has been concurrent use without evidence of

actual confusion;

(9) the variety of goods on which a Mark is or is not

used (house Mark, "family" Mark, product Mark);

(10) the Market interface between applicant and the

owner of a prior Mark;

(11) the extent to which applicant has a right to

exclude others from use of its Mark on its goods;

(12) the extent of potential confusion, i.e., whether

de minimis or substantial; and

(13) any other established fact probative of the effect

of use." See id. Coach Services, 101 USPQ2d at 1720;

The University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc., 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983) (likely to cause confusion "means more than the likelihood that the public will recall a famous Mark on seeing the same Mark used by another … To hold otherwise would result in recognizing a right in gross, which is contrary to principles of Trademark law and to concepts embodied in 15 USC § 1052(d)."). The Plaintiff's products, stun guns, are very distinctive, they could never be mistaken for one of Defendant's products.  And, Plaintiff's Mark is different than Defendant's Mark.  By contrast to Defendant's Mark, Plaintiff's Mark depicts a very stylized and distinctive pulse symbol within a circle, the circle is filled with dark, crisscrossed lines, above the name Ω-MEGA, the Ω symbol has a long line extended across the bottom of the Ω-MEGA name, all indicating an electronic product; Plaintiff chose its Mark to signify that this was the last word in self-defense; as discussed supra, omega is the 24th and last

letter of the Greek alphabet, the extreme or final part, the end.  Plaintiff joined the omega symbol, Ω, with the word "MEGA", to identify Plaintiff's products with strong use of electricity for self-defense; finally, the omega symbol, and then a hyphen, and then the word "MEGA", was also meant to approximate the Hindu holy word, Omega.

Plaintiff's Mark makes no similar commercial impression to Defendant's Marks.  The intended sound was meant, and does approximate, the sound of the Hindu holy word, Omega; and the appearance is quite different, the use of the distinctive pulse symbol within a circle further differentiates it from Defendant's Mark.  Plaintiff's Mark is completely different than Defendant's Mark.  The commercial impression of Plaintiff's Mark, when applied to same or similar goods, would cause no confusion nor be likely to cause confusion, mistake, or deception.  Plaintiff markets only four models of stun guns.

Plaintiff's Mark is not applied to the same or

similar goods of Defendant.  They do not cause any
confusion, mistake, or deception.  They have not, and
are not likely, to ever, cause confusion.  These visual
distinctions are sufficient to create different
commercial impressions of the Marks, thereby
precluding likelihood of confusion.

     Finally, the allegation of deception, to "cause
confusion, mistake, or deception", necessarily involves
intent.  Plaintiff never had any intention to deceive,
and it seems clear that no such intention was involved,
as can be seen by the obvious dissimilarity and
unrelatedness of the products.

     This allegation also tries to assume that
Plaintiff's Mark might be applied to similar goods, but
this is not a logical assertion, since the Mark itself
is different and is not likely to be confused with
Defendant's Mark, and Plaintiff has a completely
different product line.  The omega symbol, Ω, next to
the word "MEGA", and a distinctive pulse symbol within
a circle, above the name Ω-MEGA, the circle filled with

dark crisscrossed lines, above the name Ω-MEGA,; the use of the hyphen between the symbol, Ω, the bottom of the symbol Ω, merges into a line running beneath the entire name.

Defendant is, allegedly, the owner of seven U.S. registrations for OMEGA and for OMEGA and design Marks for use in connection with watches, watchbands, other horological devices, watch accessories, and electronic and computer timing apparatuses.  Defendant primarily uses its OMEGA Mark, on information and belief, in connection with luxury watches, whose prices range from, on information and belief, approximately $2,000 to $280,000.  Purchasers of such expensive goods are likely to make their purchase with significant care.

Although Defendant has allegedly been in operation since 1894, on information and belief, it has only recently begun targeting the United States with its marketing efforts.  Defendant, allegedly, has prior registrations for the OMEGA and Design Mark and/or the OMEGA Mark in connection with watches, watch

accessories, and computer and electronic apparatuses for timing equipment.

Plaintiff has sold and marketed its stun gun products for the past thirty-four (34) years, and has never had a single incident of consumer confusion; in fact, in all the time Plaintiff has been selling its stun guns; Plaintiff has never seen or encountered any of Defendant's products offered for sale.

Plaintiff's stun guns sell for between $40.00 and $100.00, well below the sales price of Defendant's watches.

Plaintiff's customers' exercise heightened care because Plaintiff's goods are for personal self-defense, and the goods are used to protect those individuals' lives.  Defendant's customer's exercise heightened care because the goods are so very expensive.

As stated, supra, the term OMEGA is not a coined brand name, but instead it is a Greek letter that is commonly known, seen, and used throughout the United

States by many others with Marks related to Defendant.
See footnote ibid.

THIRD PARTY REGISTRATIONS AND USES OF OMEGA
AND OMEGA-BASED MARKS.

In addition to Defendant and Plaintiff, on
information and belief, there are hundreds of third
parties who have used and/or registered identical, or
highly similar, OMEGA Marks to promote, advertise, and
sell their goods.  Plaintiff asks this honorable Court
to take Judicial Notice of the "Alliant case, Omega
S.A. (Omega AG) (Omega Ltd.) v. Alliant Techsystems
Inc. Opposition Nos. 91173785 and 91174067 to
Application Serial Nos. 78548473 and 78550543, which
had more than one hundred other Trademarks with the
name OMEGA, submitted to evidence, and many with the
symbol Ω in their marks.  Alliant, in the, Alliant
case, also included an omega symbol, Ω, in their Mark,
and yet it was allowed to register its Mark.  The board
dismissed watchmaker Omega S.A.'s oppositions to

Alliant Techsystems' application to register a stylized

version of Omega and Omega Elite, both with the initial

Greek letter Ω as opposed to the Roman capital "O", for

protective clothing and bags for technical gear.  In,

NATIONAL CABLE TELEVISION ASSOCIATION, INC., Appellant,

v. AMERICAN CINEMA EDITORS, INC., Appellee, 937 F.2d

1572, 19 U.S.P.Q.2d 1424, No. 90-1247. United States

Court of Appeals, Federal Circuit, July 2, 1991.,

expounded,  "Where a Mark is commonly used on numerous

types of goods and services by different companies, a

term such as PREMIUM, SUN, BLUE RIBBON, NATIONAL, GIANT

or AMERICAN, it may be reasonable to infer in some

situations that purchasers have been conditioned to

expect different sources for specifically different

goods or services even though such goods or services

might be deemed sufficiently related to be attributable

to a single source under an uncommonly used Mark.

Compare Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d

252, 259-60, 205 USPQ 969, 975-76 (5th Cir.) (no

confusion likely between DOMINO for sugar and DOMINO

1    for pizza services in presence of third party use),

2    cert. denied, 449 U.S. 899, 101 S. Ct. 268, 66 L.Ed.2d

3    129 (1980). ."

4

5        This case is remarkably similar to the case of:

6

7    Omega S.A. (Omega AG) (Omega Ltd.) v. Alliant

8    Techsystems Inc.  Opposition Nos. 91173785 and

9    91174067, supra, to Application Serial Nos. 78548473

10   and 78550543, supra, in that case the Applicant filed

11   for Trademark of their Mark, which included the name

12   OMEGA and OMEGA ELITE along with the symbol Ω.  They

13   used this Mark in connection with tactical gear and

14   equipment for military and law enforcement.  They have

15   not used or applied to register the Marks in connection

16   with watches, clocks, or timing devices.  Plaintiff

17   will provide evidence of the live registrations for

18   such Marks, sited in the Alliant case, if the Court so

19   wishes, or perhaps the Court may take Judicial Notice[1]

20

21

22

23

24

25

---

[1] Federal Rule of Evidence 201(d) provides that "[a] court shall take judicial
notice if requested by a party and supplied with the necessary information."
A judicially noticed fact "must be one not subject to reasonable dispute in
that it is either (1) generally known within the territorial jurisdiction of
the trial court or (2) capable or accurate and ready determination by resort

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF      Page 51

of the evidenced submitted in that case.  Providing

such evidence would be voluminous.  Plaintiff will also

provide, if the Court so wishes, additional evidence of

unregistered third-party uses of identical or high

similar Marks on the Internet.   Defendant took no

action or otherwise objected to the third-party

registrations or unregistered uses of, other Marks.

Defendant chose to file this action against Plaintiff,

an extremely small company, with gross revenues in 2016

of approximately $175,000.00, and a loss of

$-33,000.00; a one-man company.  A great target for

bullying.  Plaintiff will discuss the issue of

"bulling" infra.  The same Court in, Alliant

Techsystems, commented on likelihood of confusion,. . .

"whether a likelihood of confusion exists, court[s]"

consider the following factors: 1) the strength of the

owner's Mark; 2) the similarity between the owner's

Mark and the alleged infringer's Mark; 3) the degree to

which the products [or services] compete with each

to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid.
201(b).

other; 4) the alleged infringer's intent to pass off its goods [or services] as those of the Trademark owner; 5) incidents of actual confusion; and 6) whether the degree of purchaser care can eliminate any likelihood of confusion which would otherwise exist." Further in "Alliant" supra, "With regard to Opposer's likelihood of confusion claim, the situation is also remarkably similar Alpha Inds. Inc. v. Alpha Sportswear Ltd., 48 USPQ2d, 1448 (E.D. Va. 1998): in that case the plaintiff had manufactured, distributed and sold apparel and related products under its ALPHA Mark for nearly 40 years. Id. at 1449.  The plaintiff owned registrations for ALPHA for zippers, apparel, and "military-type jackets." The plaintiff advertised in national magazines, catalogs, trade shows, and had major sales to the U.S. government. The plaintiff developed the original "bomber jacket," they had been recognized in the Smithsonian's classics catalog, and, as a result, their Mark was "famous, but only in

connection with its military-type or 'bomber' jackets."

Id. at 1450. The defendant used an identical ALPHA Mark

for sportswear, primarily for athletic apparel. The

court concluded that the dozens of Trademark

registrations for the ALPHA Mark rendered the Mark

weak, even though it was famous specifically for

jackets. The court noted that there was an absence of

consumer confusion over a 15 year period of co-

existence and concluded that confusion was likely with

regard to the identical goods, jackets, but not to the

remaining goods, such as athletic uniforms.  The

District of Connecticut reached a similar conclusion in

addressing Opposer's infringement lawsuit against a

manufacturer and retailer of measurement tools for

science and industry.  Omega S.A. v. Omega Eng, Inc.,

396 F.Supp.2d 166, 178-179 (D. Conn. 2005).  The court

there concluded that Opposer and the engineering

company "are operating in completely different areas of

commerce" and therefore use of even identical Marks was

unlikely to result in consumer confusion. Id. Similarly, " ATK's applied-for goods have a very

specific use and target Market, namely, military, law enforcement, and defensive applications. Furthermore, the applied-for goods, tactical gear for use in combat, are even more unrelated than the scientific testing devices at issue in Omega Eng. Inc. As in  Alpha Sportswear and Omega Engineering, the unrelatedness of the goods, the different channels of trade, and the numerous third-party uses and registrations for identical Marks, all compel the conclusion in the present case that there is simply no likelihood of confusion between Opposer's prior registrations for watches, related accessories, and timing apparatuses with ATK's use of the Marks in connection with tactical gear . . ."

    Plaintiff avers that there is absolutely no competition between Plaintiff's products and Defendant's products; Plaintiff operates a completely

different business (different trade channels /
different types of customers), and there is absolutely
no possibility of "consumer confusion", none has ever
occurred in 34 years, (which is required to
show trademark infringement); there was absolutely no
intent to pass off Plaintiff's goods as those of
Defendant, which is patently obvious, and would
probably be impossible.  There has never been a single
incident of actual confusion; and the purchasers for
Defendant's expensive watches are certainly likely to
exercise a great amount of care when purchasing
Defendant's goods.  Further, in "Alliant", supra,
regarding Defendant's claim of likelihood of confusion,
the situation is also remarkably similar <u>Alpha Inds.</u>
<u>Inc. v. Alpha Sportswear Ltd., 48 USPQ2d, 1448 (E.D.</u>
<u>Va. 1998),</u> supra: in that case the plaintiff had
manufactured, distributed and sold apparel and related
products under its ALPHA Mark for nearly 40 years. Id.
at 1449.  The plaintiff owned registrations for ALPHA
for zippers, apparel, and "military-type jackets." The

plaintiff advertised in national magazines, catalogs,
trade shows, and had major sales to the U.S.
government.  The plaintiff developed the original
"bomber jacket," they had been recognized in the
Smithsonian's classics catalog, and, as a result, their
Mark was "famous, but only in connection with its
military-type or 'bomber' jackets." Id. at 1450.  The
defendant used an identical ALPHA Mark for sportswear,
primarily for athletic apparel.  The court concluded
that the dozens of Trademark registrations for the
ALPHA Mark rendered the Mark weak, even though it was
famous specifically for jackets.  The court noted that
there was an absence of consumer confusion over a 15
year period of co-existence and concluded that
confusion was likely with regard to the identical
goods, jackets, but not to the remaining goods, such as
athletic jackets, but not to the remaining goods, such
as athletic uniforms. Id. at 1451-52.  The District of
Connecticut reached a similar conclusion in addressing
Opposer's infringement lawsuit against a manufacturer

and retailer of measurement tools for science and industry. Omega S.A. v. Omega Eng, Inc., 396 F.Supp.2d 166, 178-179 (D. Conn. 2005). The court there concluded that Opposer and the engineering company "are operating in completely different areas of commerce" and therefore use of even identical Marks was unlikely to result in consumer confusion. Id.

Similarly, Plaintiff's applied for goods that have a very specific use and target market, namely, stun guns for self-defense and animal control. Plaintiff's stun guns are offered in distinct channels of trade, and to different classes of purchasers who would not be likely to believe that Plaintiff's goods and Defendant's goods emanate from the same source. Furthermore, the applied-for goods, stun guns, for use in self-defense and animal control, are even more unrelated than the scientific testing devices at issue in Omega Eng. Inc. As in Alpha Sportswear and Omega Engineering, the unrelatedness of the goods, the different channels of trade, and the numerous

third-party uses and registrations for identical Marks all compel the conclusion in the present case that there is simply no likelihood of confusion.  Plaintiff has not used or applied to register the Marks in connection with watches, clocks, or timing devices. LIKELIHOOD OF CONFUSION QUESTION?

Again, in "Alliant", supra, "Whether a likelihood of confusion exists between an applied-for Mark and a prior Mark is determined on a case-by-case basis applying the factors set forth in Coach Servs., Inc. v. Triumph Learning LLC, 688 F.3d 1356 at 1366 (Fed. Cir. 2012)(citations omitted).  DuPont, supra: ". . . Our determination of likelihood of confusion under (d), 15 U.S.C. §1052(d), must be based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue.  In re E.I. DuPont de Nemours & Co., 476 F.2d 1357, 177 USPQ  563 (CCPA 1973).  In considering any evidence of record bearing on these factors, we are guided by the principle that "[t]he fundamental inquiry

mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the Marks." Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976).  However, the Board is not required to consider every factor. Shen Mfg. Co. v. Ritz Hotel Ltd., 393 F.3d 1238, 1241, 73 USPQ2d 1350 (Fed. Cir. 2004). Rather, the Board must consider only the factors that are relevant and for which evidence is of record. Id.  Moreover, any one factor may control a particular case. In re Dixie Restaurants, Inc., 105 F.3d 1405, 1407, 41 USPQ2d 1531 (Fed. Cir. 1997) (citing DuPont, 476 F.2d at 1361-62).  " Coach Servs., Inc. v. Triumph Learning LLC, 688 F.3d 1356 at 1366 (Fed. Cir. 2012)(citations omitted).  Although all relevant factors should be considered, the Board may find a single DuPont factor to be dispositive. See, e.g., Kellogg Co. v.Pack'em Entrs., 951 F.2d 330, 332-33 (Fed. Cir. 1991); Pure Gold, Inc. v. Syntex (U.S.A.), Inc., 221 USPQ 151 (TTAB 1983), aff'd, 739 F.2d 624,

222 USPQ 741 (Fed. Cir. 1984)(granting summary judgment based on unrelatedness of the goods); Canada Dry Corp. v. Am. Home Prods. Crp., 68 F.2d 207, 208, 175 USPQ 557 (CCPA 1972)(finding no likelihood of confusion even for identical Marks based on the unrelatedness of the goods).  The principle applies even when the applied-for Mark is identical to a famous or well-known Mark. See Triumph Learning LLC, 688 F.3d at 1369-70; Edwards Life sciences Corp. v. VigiLanz Corp., 94 USPQ2d 1399 (TTAB 2010); Nat'l Congress of Parents & Teachers v. Pizza Transit Auth., Inc., 213 USPQ 65, 67 (TTAB 1982); Aero Mayflower Transit Co. v. Snark Prods., Inc., 190 USPQ 100 (TTAB 1976 'I Assoc. of Blue Shield Plans v. The Standard Mattress Co., 168 USPQ 380 (TTAB 1970), aff'd 478 F.2d 1253, (CCPA 1973)."

The Plaintiff's Goods Are Unrelated and Specifically Different than Watches and Timing Equipment, and which are unrelated to the Applied-for Goods of Defendant.  Defendant's watches, watch bands, timing equipment and other goods covered by its

registrations are not related to Plaintiff's applied-for goods.

The authority is legion that the question of registraibility of an applicant's Mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods.

"Where, as here, the goods of the parties on their face are specifically different, it is incumbent upon Defendant, as the party having the burden of proof, to show that the respective goods are related in some viable fashion and/or that they are Marketed or promoted under circumstances and conditions that could bring them to the attention of the same purchasers or prospective customers. Premdor, Inc. v. Safe & Sound, The Child Safety Specialists, Inc., Opp. No. 111,846 (BBN) at *13-14 (TTAB 2001)[non-precedential]; Amcor, Inc. v. Amcor Industries, Inc., 210 USPQ 70, 78 (TTAB

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 62

1   1981)).”

2      The Plaintiff's goods are not competitive; no

3   third-party uses or third-party registrations show

4

5   overlap between Defendant's registered goods and

6   Plaintiff's applied-for goods.  In fact, Defendant has

7   previously admitted, on information and belief, that

8

9   even consumers who were aware of Opposer's watches and

10  aware of Opposer's timing services did not presume that

11

12  there was a connection between the two, notwithstanding

13  the identical nature of the Mark and relatedness of

14  timing devices and watches. Defendant's admission

15  establishes that consumers will not mistakenly

16

17  associate Applicant's goods with Opposer's watches.

18     Plaintiff's applied-for goods, in its application

19  for registering its Mark, are limited for use as “stun

20

21  guns” for self-defense and animal control applications.

22  The goods are used specifically for civilian self-

23  defense or animal control; entirely different classes

24

25  of consumers and channels of trade than Defendant's

26  watches.  Consequently, it is clear, that the goods are

27

28

not related, and the stark unrelatedness of the goods
weighs heavily in favor of Plaintiff.

Defendant's contention No. 7

Opposer has a long history of sale and offering
for sale goods in Classes 009 and 014.  The
Opposer has also used its Mark in a variety of
ways in sponsorships and in areas such as
sports timing and sports and sports events in a
highly visible way, including but not limited
to as an official sponsor and official
timekeeper for the Olympics Games in Beijing,
China in 2008, Vancouver, Canada in 2010,
London, England in 2012, Sochi, Russia in 201,
as well as other professional and amateur
contests.  Opposer is in the field of
advertising and Marketing its goods and
involved in sponsorships and endorsement, which
form a major component of Opposer's brand,
Marketing efforts in the U.S. and abroad.

Answer to No. 7

Defendant cannot show that Mark is famous within the minds of the general public in the United States. Defendant, allegedly, has also provided timing equipment and timing services to the Olympics intermittently from 1932 to the present.  However, from 1976 until 2006, such services were offered under the SWATCH and SWISS TIMING brands.

Defendant's contention No. 8

Omega has used its OMEGA Marks in commerce extensively and has acquired considerable and valuable goodwill and wide recognition for its Mark. The public has come to associate the OMEGA Marks with the Opposer and Opposer's goods and services. The public has come to associate the OMEGA Marks with the Opposer and Opposer's timepieces, jewelry, sports timing products, clothing, accessories, and sports promotion.

Answer to No. 8

Nowhere has the public come to associate Defendant or any of Defendant's products (timepieces, jewelry, sports timing products, clothing, accessories, and sports promotion) with the Plaintiff's stun guns.

In the unlikely event that the Court determines that Defendant has established common law rights (or registered rights) with regard to starting guns, allegedly used in sporting events, starting guns for timing athletic events are not in anyway related to Plaintiff's applied-for goods, stun guns. Defendant must argue, incorrectly, that such goods are identical to stun guns, used as actual self-defense stun devices; that its starting guns; are related to stun guns; and are marketed in the same channels of trade. All incorrect.

Defendant's contention No. 9

On information and belief, use by the Applicant will cause confusion, mistake, and deception with respect to those goods and services, by virtue of the Opposer's priority and fame of

its OMEGA Marks.

Answer to No. 9

Plaintiff has provided much information, supra, concerning there is no possibility of confusion between Plaintiffs goods and Defendant's goods and services.

Defendant's contention No. 10

On information and belief, both the Applicant's Mark and the OMEGA Marks are applied to highly related goods and services and are likely to be sold to the same or similar channels of distribution. Applicant's Mark so resembles Omega's well-known OMEGA Marks, as used in the United States and not abandoned, as to be likely to cause confusion or to cause mistake or to deceive.

Answer to No. 10

The goods are unrelated and specifically different. Plaintiff avers that there is no reasonable legal argument as to how the goods covered by its registrations are related to Plaintiff's applied-for

goods, namely, stun guns, for personal self-defense and/or animal control.  Watches, watchbands, timing equipment, and other goods covered by Defendant's registrations are unrelated to the applied-for goods of Plaintiff.  The . . . "presumption that goods will travel in all channels of trade is incorrect, instead, it is presumed that goods will travel in "all normal channels and to all prospective purchasers for the relevant goods." Triumph Learning LLC, 668 F.3d at 1370-71".

Plaintiff never had any intent to deceive.  The absolute difference in the appearance of the Plaintiff's goods, when compared to Defendant's goods, makes it patently clear that there was never any intent to deceive.  Plaintiff, again, points out that the goods of Plaintiff are not related goods and services, in contrast to Defendant's goods and services.  As explained, supra, they are never sold in the same or similar channels of distribution.  Also, supra, Plaintiff has shown the differences in the appearance

of Plaintiff's Mark, in contrast to Defendant's Mark. And Plaintiff has shown, supra, that there is no likelihood of confusion, for all the reason stated.

The issue is not whether the respective Marks themselves, or the goods or services offered under the Marks, are likely to be confused but, rather, whether there is a likelihood of confusion as to the source or sponsorship of the goods or services because of the Marks used thereon. See, e.g., Paula Payne Prods. Co. v. Johnson's Pubs' Co., 473 Ph.D. 901, 902, 177 SUP 76, 77 (C.C.P.A. 1973), ibid, ("[T]he question is not whether people will confuse the Marks, but rather whether the Marks will confuse people into believing that the goods they identify emanate from the same source."). Plaintiff answers, this is not likely. "("The degree of 'relatedness' must be viewed in the context of all the factors, in determining whether the services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship."); In re Binion, 93 USPQ2d 1531, 1534,

1535 (TTAB 2009); In re Ass'n of the U.S. Army, 85

USPQ2d 1264, 1267-68, 1270 (TTAB 2007); Hilson Research

Inc. v. Soc'y for Human Res. Mgmt., 27 USPQ2d 1423,

1429 (TTAB 1993)".


            Defendant's contention No. 11

            Upon information and belief, Applicant's

            actions would substantially harm the Opposer,

            by permitting registration in favor of

            Applicant for a Mark, which the Opposer used on

            its goods from an earlier date.

Answer to No. 11

    The meager business of the Plaintiff, gross revenue

in 2016 of 175,000.00, and a 2016 loss of $33,000.00,

can in no way harm the Defendant.  As stated, supra,

Plaintiff is an extremely small business that does

business in completely different channels of

distribution.

    PROFESSOR and JUDGE MCCARTHY, supra, "If so

trivial a registered use can be held likely to damage

the OMEGA Mark for watches, then the watch company truly would have a monopoly on all commercial use of a letter from the Greek alphabet. To me, that would expand Trademark law beyond all reasonable bounds. I think there could be "blurring" only if when people see the and that will impair the strength of the OMEGA Mark. Omega v Alpha Phi Omega, 118 U.S.P.Q. 2d 1289, 1300 (T.T.A.B. 2016)".

There could be "blurring" only if and when people see the OMEGA watch Mark, they will think of the OMEGA stun guns and that will impair the strength of the OMEGA Mark.  There is no way for people viewing the defendant's Mark that they will think of Plaintiff's stun guns.

Defendant's contention No. 12

Opposer's OMEGA Marks are famous and well known in the United States and throughout the world. Answer to No. 12

Fame is defined as —the condition of being known or talked about by many people, [especially] on account of

notable achievement.[1]

The factor of 'fame' warrants reasonable weight, among the totality of the circumstances. It should be viewed under the totality of the circumstances in relation to other confusion factors; how the mark is actually used and viewed by the consumer is part of the totality of the circumstances of the likelihood of confusion.  After reviewing dilution theory and the legislative intent. . .  the Court , the Ninth Circuit, "emphasized the role of the fame requirement in "reinstating the balance" in the Lanham Act to avoid "over-protecting trademarks, at the expense of potential non-infringing uses." Id. at 875.  "Despite the fact that the registered marks had acquired distinctiveness and that four of the eight statutory fame factors favored a finding that the marks were famous, the Ninth Circuit held that, as a matter of law, Avery Dennison had failed to meet its burden of proving fame for two reasons. Id. at 876-77.  First,

---

[1] THE OXFORD COLLEGE DICTIONARY 495 (2d ed. 2007)

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF       Page 72

while recognizing that fame in a "specialized market segment" might be adequate if the "diluting uses are directed narrowly at the same market segment," the Court noted that Avery Dennison provided no evidence of customer overlap or that defendant's customers possessed any degree of recognition of plaintiff's marks. Id. at 877-78. Second, widespread third-party use of the names "Avery" and "Dennison" undermined the famousness of the marks. Id.at 878.  Thus, the Court held that the marks were not entitled to protection under the FTDA."

    In the United States, a mark must be widely recognized by the general consuming public to be famous.  In its amendments to Section 43(c) of the Lanham Act, the <u>Trademark Dilution Revision Act of 2006 (TDRA)</u> defined a famous mark for a dilution claim as one that is widely recognized by the general US consuming public as a designation of source of the goods or services of the mark's owner <u>(15 U.S.C. § 1125(c)(2)(A))</u>.  Some courts have characterized the

test as requiring that the mark rise to the level of
being a "household name" (see, for example, T-Mobile
US, Inc. v. AIO Wireless LLC, 991 F. Supp. 2d 888, 930
(S.D. Tex. Jan. 22, 2014)).  As will be stated again,
infra, in a dilution claim, the law requires that the
Mark holder prove that its Mark is widely recognized by
the general public.  When the Mark is also a common
word, such as omega, the Mark holder must also
demonstrate that those ordinary "uses of the mark are
now eclipsed by the owner's use of the Mark ... in
almost any context" and that the Mark has become "a
household name."  For a Mark to be considered famous,
it must have achieved extensive public recognition,
which generally means that the Mark is instantly
recognizable.  The protection provided under the TDRA
is reserved for only a very few worthy trademarks in
the United States.  Indeed, Congress only wanted anti-
dilution protection for a very few deserving
trademarks. To adhere to the language and the intent of
the statute, courts must interpret the phrase —widely

recognized by the general consuming public of the United States‖ to mean that the mark must have national fame Some actual evidence of consumer recognition[1].  A companies fame should be restricted to a narrow category of marks, ensuring that it does not swallow infringement law by allowing mark owners to end-run a likelihood of confusion analysis which they fear — or, indeed, know — they cannot win.

Defendant is not a household name.  Defendant has certainly not eclipsed the very common word "omega". Coach Services v. Triumph Learning (Fed. Cir. 2011), ibid.  Coach Services argued that Triumph's use of COACH for its services blurred the power of the Mark by using it for non-related, non-luxury goods.  In a dilution claim, the law requires that the Mark holder prove that its Mark is widely recognized by the general public.  Defendant's Mark has not become a household

---

[1] Anti-dilution protection for famous marks means ―a limited group of marks that are genuinely famous.‖ TDRA Hearings, supra note 75, at 10; see also H.R. REP. NO. 109-23, at 8(2005) (―In addition, the [TDRA] expands the threshold of ‗fame' and thereby denies protection for marks that are famous only in ‗niche' markets.‖); Duvall, supra note 28, at 1262 (―TheTDRA's revised fame standard will help keep dilution law in check and should resolve the concerns of most critics that the FTDA was too often applied in cases where it was not justified.‖).

name that overwhelms the ordinary use of the word omega.

There is no association of Plaintiff's stun gun products and those of the Defendant's products, arising from the similarity between Plaintiff's Mark and a Defendant's Mark, that harms the reputation of the Defendant's Mark.

Plaintiff's products do not cast Defendant's Mark in unflattering light, and Defendant's Mark is not associated with an inferior or unseemly products, to wit, no Tarnishment.  The principles of equity must, certainly, still apply.

Defendant's contention No. 13

Upon information and belief, Opposer's OMEGA Marks were famous prior to established, continuous use of Applicant's Mark.

Answer to No. 13

Please see supra, that the Defendant's Marks are not famous they are not instantly recognizable and

have not become household names that overwhelm the ordinary use of the word omega.

Defendant's contention No. 14  On information and belief, the Applicant's Mark is likely to diminish and dilute the value and distinctive character of Opposer's famous OMEGA Marks, thus damaging Opposer.

Answer to No. 14

According to professor McCarthy dilution by blurring takes place when the defendant's use of its mark causes the identifying features of the plaintiff's famous mark to become vague and less distinctive. To prove dilution by blurring, the owner of a famous mark must prove that the capacity of its mark to continue to be strong and famous would be endangered by the defendant's use of its mark.  The FTDA defines "dilution" as "the lessening of the capacity of a famous Mark to identify and distinguish goods or services, regardless of the presence or absence of: (1)

competition between the owner of the famous Mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.  There is no lessening of the capacity of the overall commercial impression of Plaintiff's Mark, when applied to same or similar goods that would cause confusion or be likely to cause confusion, mistake, or deception.  Use of Plaintiff's Mark could never blur, make dim, indistinct or indefinite, Defendant's Mark. ("Blurring" in this context means "to make dim, indistinct or indefinite." Webster's Third New International Dictionary 243 (1968). OMEGA the watch company alleged that collegiate fraternity Alpha Phi Omega's use of its name in Greek letters (???) on shirts would dilute the OMEGA Mark in English or as the Greek letter? The Trademark Board denied applicant's motion for summary dismissal of the opposition to its application for the three Greek letters. On fraternity T-shirts would be likely to impair the distinctiveness of the OMEGA Marks for

watches. . . .   In, *Coach Services v. Triumph Learning (Fed. Cir. 2011)*, ibid, Coach Services argued that Triumph's use of COACH for its services blurred the power of the Mark by using it for non-related, non-luxury goods.  In a dilution claim, the law requires that the Mark holder prove that its Mark is widely recognized by the general public. When the Mark is also a common word, such as omega, the Mark holder must also demonstrate that those ordinary "uses of the Mark are now eclipsed by the owner's use of the Mark. . .  in almost any context" and that the Mark has become "a household name."  Defendant is not a household name, and has certainly not eclipsed the very common word "omega".  *Coach Services v. Triumph Learning (Fed. Cir. 2011)*, ibid.  Coach Services argued that Triumph's use of COACH for its services blurred the power of the Mark by using it for non-related, non-luxury goods.  In a dilution claim, the law requires that the Mark holder prove that its Mark is widely recognized by the general

public. When the Mark is also a common word, such as

omega, the Mark holder must also demonstrate that those

ordinary "uses of the Mark are now eclipsed by the

owner's use of the Mark. . .  in almost any context"

and that the Mark has become "a household name."  For a

Mark to be considered famous, it must have achieved

extensive public recognition. Defendant's Mark has not

become a household name that overwhelms the ordinary

use of the word omega.  Restatement (Third) of Unfair

Competition § 25 cmt. e (1995 Main Vol.); see 4

McCarthy, supra, § 24:112. We are persuaded that a mark

not famous to the general public is nevertheless

entitled to protection from dilution where both the

plaintiff and defendant are operating in the same or

related markets, so long as the plaintiff's mark

possesses a high degree of fame in its niche market.

Plaintiff and Defendant operate in completely distinct

and unrelated markets.

    Plaintiff's products do not cast Defendant's Mark

in an unflattering light, and Defendant's Mark is not

associated with inferior or unseemly products, to wit,

no Tarnishment.

Channels of trade can be assumed that the goods

will travel in the same channels of trade.  However the

presumption does not mean that goods will travel in all

channels of trade.  Instead, it is only presumed that

the goods will travel in "all normal channels and to

all prospective purchasers for the relevant goods."

Triumph Learning LLC, 668 F.3d at 1370-71, ibid.

Therefore the questions are, what are the normal

channels of trade for "stun guns" and whether those can

be presumed to be the same channels of trade for

watches and/or computer or automated apparatuses for

determining time and distance. Defendant will be unable

to rely on any potential overlap with any of its

claimed common law rights, because "there is no

possible evidence regarding the sales or Marketing of

these items." Id. at 1370 n.4.  Plaintiff's goods

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 81

consist of stun guns, which, as previously defined, mean equipment for use self-defense or animal control. Additionally, Plaintiff's identification of goods is not unrestricted but instead is limited to stun guns.

The channels of trade for Plaintiff's goods may be presumed to be whatever is normal for stun guns, for use in self-defense or animal control, to wit, gun shows, gun dealers, internet searchers for stun guns. Logically there is no overlap between stun guns with watches and/or timing devices; Defendant Markets its luxury goods through other channels.  On information and belief, Defendant has its own branded stores that sell only Defendant's goods; also Defendant authorizes a limited number of third-party stores to sell some of Defendant's goods.   In Triumph Learning, ibid, the Opposer alleged that there was a likelihood of confusion between the applicant's identical COACH Mark for use in connection with educational test preparation materials based on the Opposer's extensive use in connection with handbags, apparel, and other goods. Id.

The Federal Circuit rejected this claim, noting that the applicant "Marketed] its products through catalogs, direct mail, and personal sales representatives" whereas the Opposer sold its products through its own retail stores and some third-party retailers. Id. The Court affirmed the Board's conclusion that "the channels of trade are distinct," reasoning that "[applicant] targets educational professionals with responsibility for purchasing educational materials." Id.

Plaintiff, THE O-MEGA NETWORK, INC., has made several Offers for settlement of this matter, supra. The Defendant has rejected all Offers for settlement. On June 5, 2018, Defendant's attorney, Marie Anne Mastrovito, acknowledged receipt of Plaintiff's Notice of Rescission, and added, "At any rate, the proposals were not acceptable to my client."  Indicating that all Plaintiff's offers for settlement have been rejected. VIOLATION OF UNITED STATES ANTI-TRUST LAWS IS A DEFENSE TO TRADEMARK:  USURPING, UNCLEAN HANDS,{tc

"UNCLEAN HANDS"} and ANTI-TRUST VIOLATIONS{tc "ANTI-TRUST VIOLATIONS"}

It is certainly the law of equity that one who requests equitable relief must come before the court with clean hands.  Plaintiff asserts that Defendant has tried to appropriate to itself the rights under its Trademarks in order to create a monopoly.

Defendant's behavior is unreasonable, even if it was ancillary to allegedly legal transactions, namely, protecting their rights.  That fiction can easily be seen through, it becomes apparent that their real motive and purpose was to "bully" a small, one-person company, with gross sales, in 2016, of approximately $175,000.00.  Defendant's monopolistic behavior is a violation of the law, as stated, supra, there is a great distinction between protecting one's legal right and using street brawling tactics.

Defendant's real motive and purpose was to eliminate competition.  Justice Black in Timken Co. v. U.S., 341 US at 93* at 598, "A Trademark cannot be

legally used as a device for Sherman Act violations.
Indeed, the Trademark act of 1946 itself penalizes use
of a Mark "to violate the anti-trust laws of the United
States" and it cites 60 Statutes 427, 439, Section 33
(b)(7), 15 USC, Sections 1051, and 1115 (6)(b)(7).

The Issues before the Court are relatively
straightforward. Would any consumers encounter both
Defendant's luxury watches as well Plaintiff's stun
guns?  This is doubtful.  If so, in light of the
differences in the goods, channels of trade, conditions
of sale, and the extent of third-party use of similar
or identical Marks, would this hypothetical consumer
mistakenly believe that the luxury watch manufacturer
was in some way affiliated with Plaintiff's stun guns?

BURDEN OF PROOF:

Plaintiff avers that Defendant bears the burden of
establishing that there is a likelihood of confusion by
a preponderance of the evidence.  Cunningham, 222 F.3d
at 943, 55 USPQ2d at 1848.

Defendant has the burden to establish a likelihood

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 85

of confusion by a preponderance of the evidence between Plaintiff's Marks for use in connection with stun guns, animal control, and other defensive applications, with Defendant's registered rights in connection with watches, watch accessories, timing equipment, or Defendant's claimed common law rights in various promotional goods.

Whether Defendant's registered goods and services, namely, watches, watch-related accessories, computer and electronic apparatuses for timing purposes, are sufficiently related to Plaintiff's applied-for goods, namely, stun guns, which, by definition, are designed, marketed, sold, and used specifically for self-defense, animal control, or other defensive applications. Plaintiff's goods and the goods of the Defendant, on their face, are specifically different. There is no viable theory that they are marketed or promoted under circumstances and conditions that could bring them to the attention of the same purchasers or customers.

Plaintiff's applied-for goods are limited for use

as stun guns, for self-defense applications.  The goods

are used specifically for self-defense and animal

control, and are marketed toward different classes of

consumers and channels of trade than Defendant's

watches.

LIKELIHOOD OF CONFUSION:

    Plaintiff avers that this is the most important

factor to be considered, whether Defendant has carried

its burden to establish a likelihood of confusion by a

preponderance of the evidence between Plaintiff's

Marks, for use in connection with stun guns for self-

defense and animal control and other defensive

applications, with Defendant's registered rights in

connection with watches, watch accessories, timing

equipment, or Defendant's claimed common law rights.

    In the 2016 T.T.A.B.Omega case, Omega v Alpha Phi

Omega, 118 U.S.P.Q. 2d 1289, 1300 (T.T.A.B. 2016),

ibid, OMEGA watch alleged that collegiate fraternity

Alpha Phi Omega's use of its name in Greek letters

(???) on shirts would dilute the OMEGA Mark in English

or as the Greek letter. . . . The Trademark Board denied applicant's motion for summary dismissal of the opposition to its application for the three Greek letters.

TRADEMARK BULLY:

(PROFESSOR MCCARTHY excerpt from the July 15th post) (emphasis mine). "In my opinion, the Board should have found that there is no plausible situation under which the Greek lettered name of the fraternity on T-shirts would be likely to impair the distinctiveness of the OMEGA or? Marks for watches."

Plaintiff avers that such an insignificant Mark can never be likely to damage the Defendant's Mark for its luxurious watches.  To allow such a designation would then ostensibly give Defendant a monopoly on all commercial use of a letter from the Greek alphabet.

Professor McCarthy, supra, "To me, that would expand Trademark law beyond all reasonable bounds."

The USPTO defines a Trademark Bully as "a Trademark owner that uses its Trademark rights to harass and

intimidate another business beyond what the law might be reasonably interpreted to allow."  a smaller entity or individual without resources and thus more likely to give in quickly, even if they have a valid defense.

Possibly the most important case in regards to the question of likelihood of confusion:  DUPONT n re E. I. du Pont de Nemours & Co., Du Pont, 476 F.2d at 1361, 177 USPQ at 567.the U.S. Court of Customs and Patent Appeals discussed the factors relevant to a determination of likelihood of confusion. 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973).  In setting forth the factors, the court cautioned that, with respect to determining likelihood of confusion, "[t]here is no litmus rule which can provide a ready guide to all cases." Id. at 1361, 177 USPQ at 567. Not all of the factors are relevant and only those relevant factors for which there is evidence in the record must be considered.

Although the weight given to the relevant du Pont

factors may vary, the following two factors are key considerations in any likelihood of confusion determination: The similarity or dissimilarity of the Marks in their entireties as to appearance, sound, connotation and commercial impression.  The relatedness of the goods or services as described in the application and registration(s).

The issue is not whether the respective Marks themselves, or the goods or services offered under the Marks, are likely to be confused but, rather, whether there is a likelihood of confusion as to the source or sponsorship of the goods or services because of the Marks used thereon. See, e.g., Paula Payne Prods. Co. v. Johnson's Publ'g Co., 473 F.2d 901, 902, 177 USPQ 76, 77 (C.C.P.A. 1973) ("[T]he question is not whether people will confuse the Marks, but rather whether the Marks will confuse people into believing that the goods they identify emanate from the same source."); ("The degree of 'relatedness' must be viewed in the context of all the factors, in determining whether the

services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship."); In re Binion, 93 USPQ2d 1531, 1534, 1535 (TTAB 2009); In re Ass'n of the U.S. Army, 85 USPQ2d 1264, 1267-68, 1270 (TTAB 2007); Hilson Research Inc. v. Soc'y for Human Res. Mgmt., 27 USPQ2d 1423, 1429 (TTAB 1993) ("Although confusion, mistake or deception about source or origin is the usual issue posed under Section 2(d), any confusion made likely by a junior user's Mark is cause for refusal; likelihood of confusion encompasses confusion of sponsorship, affiliation or connection.").

Another case which provides factors to be considered: "Whether a likelihood of confusion exists between an applied-for Mark and a prior Mark is determined on a case-by-case basis applying the thirteen non-exclusive factors set forth in Coach Servs., Inc. v. Triumph Learning LLC, 688 F.3d 1356 at 1366 (Fed. Cir. 2012)(citations omitted), ibid.

"Likelihood of Confusion, Our determination of the

issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), ibid.  See also In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the Marks and the similarities between the goods. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24(CCPA 1976). . . .

     Plaintiff's applied for goods are limited for use as stun guns, for self defense applications.  The goods are used specifically for self-defense and animal control, and are Marketed toward different classes of consumers and channels of trade than Defendant's watches.

LIKELIHOOD OF CONFUSION (the key element):

     Many Courts suggest that this is the test to be used. DUPONT In re E. I. du Pont de Nemours & Co., Du

Pont, 476 F.2d at 1361, 177 USPQ at 567, ibid.  The

U.S. Court of Customs and Patent Appeals discussed the

factors relevant to a determination of likelihood of

confusion. 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973).

In setting forth the factors, the court cautioned that,

"with respect to determining likelihood of confusion,

"[t]here is no litmus rule which can provide a ready

guide to all cases." Id. at 1361, 177 USPQ at 567. Not

all of the factors are relevant and only those relevant

factors for which there is evidence in the record must

be considered. . . "Although the weight given to the

relevant du Pont factors may vary, the following two

factors are key considerations in any likelihood of

confusion determination: The similarity or

dissimilarity of the Marks in their entireties as to

appearance, sound, connotation and commercial

impression.  The relatedness of the goods or services

as described in the application and registration(s).

     The issue is not whether the respective Marks

themselves, or the goods or services offered under the

Marks, are likely to be confused but, rather, whether there is a likelihood of confusion as to the source or sponsorship of the goods or services because of the Marks used thereon. See, e.g., Paula Payne Prods. Co. v. Johnson's Publ'g Co., 473 F.2d 901, 902, 177 USPQ 76, 77, ibid, (C.C.P.A. 1973) ("[T]he question is not whether people will confuse the Marks, but rather whether the Marks will confuse people into believing that the goods they identify emanate from the same source."); ("The degree of 'relatedness' must be viewed in the context of all the factors, in determining whether the services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship."); In re Binion, 93 USPQ2d 1531, 1534, 1535 (TTAB 2009); In re Ass'n of the U.S. Army, 85 USPQ2d 1264, 1267-68, 1270 (TTAB 2007); Hilson Research Inc. v. Soc'y for Human Res. Mgmt., 27 USPQ2d 1423, 1429 (TTAB 1993) ("Although confusion, mistake or deception about source or origin is the usual issue posed under Section 2(d), any confusion made likely by a junior user's

Mark is cause for refusal; likelihood of confusion encompasses confusion of sponsorship, affiliation or connection.").

The Goods Are Unrelated and Specifically Different, Watches and Timing Equipment are Unrelated to the Applied for Goods of Plaintiff. The goods of the Plaintiff are clearly very different than those of the Defendant. The Marks are also quite different as discussed supra, and the Marketing Channels and Classes of Consumers Are Distinct.

The goods of the Plaintiff are marketed in completely different channels of trade than those of the Defendant, also discussed supra. The sophistication of the consumer must also be considered. Defendant's stun guns are used primarily for self-defense and animal control. The customers of these items are very careful in their selection because it is for their personal safety against attackers or animal attacks. Whereas, the Defendant's products are very distinctive and

expensive; their customers would likely use great care in purchasing such expensive items.

Fame, as to the strength of the Defendant's Mark, as also discussed supra, it is probably known to only a very small fraction of the public, those in the market for very high priced watches, and is therefore is weak.

The Marks have serious differences in appearance, which are immediately obvious to any customer.

PLAINTIFF'S ALLEGATIONS:

Violation of united states anti-trust laws is a defense to trademark; usurping, unclean hands,{tc "UNCLEAN HANDS"} and anti-trust violations.{tc "ANTI-TRUST VIOLATIONS"}

It is certainly the law of equity that one who requests equitable relief must come before the court with clean hands.

Plaintiff asserts that Defendant has tried to appropriate to itself the rights under its Trademarks in order to create a monopoly.

Their behavior is unreasonable, even if it was ancillary to allegedly legal transactions, namely, protecting their rights; that fiction can easily be seen through, it becomes apparent that their real motive and purpose was to "bully" a small, one-person company, with gross sales, in 2016, of approximately

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 96

$175,000.00.  Defendant's monopolistic behavior is a violation of the law, as stated, supra, there is a great distinction between protecting one's legal right and using street brawling tactics.

Their fiction can easily be seen through, at which time it becomes apparent that their real motive and purpose was to eliminate competition.  Justice Black in Timken Co. v. U.S., 341 US at 93* at 598, "A Trademark cannot be legally used as a device for Sherman Act violations.  Indeed, the Trademark act of 1946 itself penalizes use of a Mark "to violate the anti-trust laws of the United States" and it cites 60 Statutes 427, 439, Section 33 (b)(7), 15 USC, Sections 1051, and 1115 (6)(b)(7).

The Issues before the Court are relatively straightforward. Would any consumers encounter both Defendant's luxury watches as well Plaintiff's stun guns?  This is doubtful.

BURDEN OF PROOF:

Plaintiff avers that Defendant bears the burden of establishing that there is a likelihood of confusion by a preponderance of the evidence.  Cunningham, 222 F.3d at 943, 55 USPQ2d at 1848.

Defendant has the burden to establish a likelihood of confusion by a preponderance of the evidence between Plaintiff's Marks for use in connection with stun guns, animal control, and other defensive applications, with Defendant's registered

rights in connection with watches, watch accessories, timing equipment, or Defendant's claimed common law rights in various promotional goods.

Plaintiff's applied-for goods are limited for use as stun guns, for self-defense applications.  The goods are used specifically for self-defense and animal control, and are marketed toward different classes of consumers and channels of trade than Defendant's watches.

LIKELIHOOD OF CONFUSION:

Plaintiff avers that this is the most important factor to be considered, whether Defendant has carried its burden to establish a likelihood of confusion by a preponderance of the evidence between Plaintiff's Marks, for use in connection with stun guns for self-defense and animal control and other defensive applications, with Defendant's registered rights in connection with watches, watch accessories, timing equipment, or Defendant's claimed common law rights.

In the 2016 T.T.A.B.Omega case, Omega v Alpha Phi Omega, 118 U.S.P.Q. 2d 1289, 1300 (T.T.A.B. 2016), ibid, OMEGA watch alleged that collegiate fraternity Alpha Phi Omega's use of its name in Greek letters (???) on shirts would dilute the OMEGA Mark in English or as the Greek letter. . . . The Trademark Board denied applicant's motion for summary dismissal of the opposition to its application for the three Greek letters.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF        Page 98

**TRADEMARK BULLY:**

(PROFESSOR MCCARTHY excerpt from the July 15th post) (emphasis mine). "In my opinion, the Board should have found that there is no plausible situation under which the Greek lettered name of the fraternity on T-shirts would be likely to impair the distinctiveness of the OMEGA or? Marks for watches."

Plaintiff avers that such an insignificant Mark can never be likely to damage the Defendant's Mark for its luxurious watches.  To allow such a designation would then ostensibly give Defendant a monopoly on all commercial use of a letter from the Greek alphabet.

Professor McCarthy, supra, "To me, that would expand Trademark law beyond all reasonable bounds."

The USPTO defines a <u>Trademark Bully</u> as "a Trademark owner that uses its Trademark rights to harass and intimidate another business beyond what the law might be reasonably interpreted to allow."  a smaller entity or individual without resources and thus more likely to give in quickly, even if they have a valid defense.

Possibly the most important case in regards to the question of likelihood of confusion:  DUPONT n re E. I. du Pont de Nemours & Co., Du Pont, 476 F.2d at 1361, 177 USPQ at 567.
 the U.S. Court of Customs and Patent Appeals discussed the

factors relevant to a determination of likelihood of confusion. 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973).  In setting forth the factors, the court cautioned that, with respect to determining likelihood of confusion, "[t]here is no litmus rule which can provide a ready guide to all cases." Id. at 1361, 177 USPQ at 567. Not all of the factors are relevant and only those relevant factors for which there is evidence in the record must be considered.

Although the weight given to the relevant du Pont factors may vary, the following two factors are key considerations in any likelihood of confusion determination: The similarity or dissimilarity of the Marks in their entireties as to appearance, sound, connotation and commercial impression.  The relatedness of the goods or services as described in the application and registration(s).

The issue is not whether the respective Marks themselves, or the goods or services offered under the Marks, are likely to be confused but, rather, whether there is a likelihood of confusion as to the source or sponsorship of the goods or services because of the Marks used thereon. See, e.g., <u>Paula Payne Prods. Co. v. Johnson's Publ'g Co., 473 F.2d 901, 902, 177 USPQ 76, 77 (C.C.P.A. 1973)</u> ("[T]he question is not whether people will confuse the Marks, but rather whether the Marks will

confure people into believing that the goods they identify emanate from the same source."); ("The degree of 'relatedness' must be viewed in the context of all the factors, in determining whether the services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship."); <u>In re Binion, 93 USPQ2d 1531, 1534, 1535 (TTAB 2009); In re Ass'n of the U.S. Army, 85 USPQ2d 1264, 1267-68, 1270 (TTAB 2007); Hilson Research Inc. v. Soc'y for Human Res. Mgmt., 27 USPQ2d 1423, 1429 (TTAB 1993)</u> ("Although confusion, mistake or deception about source or origin is the usual issue posed under Section 2(d), any confusion made likely by a junior user's Mark is cause for refusal; likelihood of confusion encompasses confusion of sponsorship, affiliation or connection.").   .

Another case which provides factors to be considered: "Whether a likelihood of confusion exists between an applied-for Mark and a prior Mark is determined on a case-by-case basis applying the thirteen non-exclusive factors set forth in <u>Coach Servs., Inc. v. Triumph Learning LLC, 688 F.3d 1356 at 1366 (Fed. Cir. 2012)(citations omitted)</u>, ibid.

Plaintiff's applied for goods are limited for use as stun guns, for self defense applications.  The goods are used specifically for self-defense and animal control, and are Marketed toward different classes of consumers and channels of

1  trade than Defendant's watches.

2  LIKELIHOOD OF CONFUSION (the key element):

3      Many Courts suggest that this is the test to be used.

4  DUPONT In re E. I. du Pont de Nemours & Co., Du Pont, 476 F.2d

5  at 1361, 177 USPQ at 567, ibid.  The U.S. Court of Customs and

6  Patent Appeals discussed the factors relevant to a determination

7  of likelihood of confusion. 476 F.2d 1357, 177 USPQ 563

8  (C.C.P.A. 1973).  In setting forth the factors, the court

9  cautioned that, "with respect to determining likelihood of

10 confusion, "[t]here is no litmus rule which can provide a ready

11 guide to all cases." Id. at 1361, 177 USPQ at 567. Not all of

12 the factors are relevant and only those relevant factors for

13 which there is evidence in the record must be considered. . ."

14

15

16     The issue is not whether the respective Marks themselves, or

17 the goods or services offered under the Marks, are likely to be

18 confused but, rather, whether there is a likelihood of confusion

19 as to the source or sponsorship of the goods or services because

20 of the Marks used thereon. See, e.g., Paula Payne Prods. Co. v.

21 Johnson's Publ'g Co., 473 F.2d 901, 902, 177 USPQ 76, 77, ibid,

22 (C.C.P.A. 1973) ("[T]he question is not whether people will

23 confuse the Marks, but rather whether the Marks will confuse

24 people into believing that the goods they identify emanate from

25 the same source."); ("The degree of 'relatedness' must be viewed

26 in the context of all the factors, in determining whether

27

28

the services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship."); In re Binion, 93 USPQ2d 1531, 1534, 1535 (TTAB 2009); In re Ass'n of the U.S. Army, 85 USPQ2d 1264, 1267-68, 1270 (TTAB 2007); Hilson Research Inc. v. Soc'y for Human Res. Mgmt., 27 USPQ2d 1423, 1429 (TTAB 1993) ("Although confusion, mistake or deception about source or origin is the usual issue posed under Section 2(d), any confusion made likely by a junior user's Mark is cause for refusal; likelihood of confusion encompasses confusion of sponsorship, affiliation or connection.").

The Goods Are Unrelated and Specifically Different. Watches and Timing Equipment are Unrelated to the Applied for Goods.

The goods of the Plaintiff are marketed in completely different channels of trade than those of the Defendant.  The sophistication of the consumer must also be considered. Defendant's stun guns are used primarily for self-defense and animal control.  The customers of these items are very careful in their selection because it is for their personal safety against attackers or animal attacks.  Whereas, the Defendant's products are very distinctive and expensive; their customers would likely use great care in purchasing such expensive items.

Fame, as to the strength of the Defendant's Mark, as also

discussed supra, it is probably known to only a very small fraction of the public, and is therefore is weak.

The Marks have serious differences in appearance, which are immediately obvious to any customer.

COMMON LAW:

Defendant has no established prior common law rights, and Defendant cannot prove or show it has any common law rights.

PLAINTIFF'S INTENT:

The Plaintiff's "intent in selecting the Mark" as discussed supra, the Plaintiff's intent on selecting its Mark was completely innocent and had no intent to deceive the public, or to copy or appropriate the Defendant's Mark.

PLAINTIFF'S POTENTIAL EXPANSION:

Plaintiff has no intent to expand his business or compete with the Defendant.  This is obvious when comparing the goods of the respective parties.

ACTUAL CONFUSION, SLEEKCRAFT AND DU PONT ANSWERS:

Perhaps this is the most important of the factors to be considered.  Whether a likelihood of confusion exists, "court[s] consider the following factors from Du Pont, suggesting that these are the primary factors to be considered in questions of likelihood of confusion.  (from Du Pont, ibid,):  1) the strength of the owner's Mark; 2) the similarity between the owner's Mark and the alleged infringer's Mark; 3) the

degree to which the products [or services] compete with each other; 4) the alleged infringer's intent to pass off its goods [or services] as those of the Trademark owner …; 5) incidents of actual confusion; and 6) whether the degree of purchaser care can eliminate any likelihood of confusion which would otherwise exist.  Also, Sleekcraft Boats, ibid, gives similar factors in judging consumer confusion.

The sine qua non of Trademark infringement is consumer confusion.  To determine the likelihood of consumer confusion, we apply the long-established factors set forth in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348—54 (9th Cir.1979), ibid. The Sleekcraft factors include

SIMILARITY OF THE MARKS:

The Marks have serious and obvious differences, which are immediately obvious to any customer.

THE EXTENT OF POTENTIAL CONFUSION:

Not really possible considering the clear differences between Plaintiff's goods and those of the Defendant.

BULLYING AND PUNITIVE DAMAGES:

Defendant's behavior was not reasonable! just because they were ancillary to allegedly legal transactions, namely, protecting their rights.  Their fiction can easily be

seen, at which time it becomes apparent that their real motive

and purpose was to "bully" a very small, one-person company.

The USPTO[1] defines a Trademark bully, as "a Trademark owner that

uses its Trademark rights to harass and intimidate another

business

beyond what the law might be reasonably interpreted to allow.

Furthermore, defendants' actions are monopolistic; there is a

great distinction between protecting one's legal right and using

street brawling tactics, such as "bullying".

**VIOLATION OF UNITED STATES ANTI-TRUST LAWS**

**IS A DEFENSE TO TRADEMARK"**

    Though a monopoly is granted by Trademark, it does not

allow a Defendant to take for itself, and declare that it owns,

a common symbol, which is in the public domain.  And to try and

enforce it's claim using its superior economic position to try

and force Plaintiff's submission.  Clearly this is

anti-competitive behavior.{tc "VIOLATION OF UNITED STATES ANTI-

TRUST LAWS IS A DEFENSE TO TRADEMARK, ESPECIALLY A CONTESTABLE

MARK"}

---

[1] "REPORT TO CONGRESS Trademark Litigation Tactics and
Federal Government Services to Protect Trademarks and Prevent
Counterfeiting, April 2011,
https://www.uspto.gov/ip/TMLitigationReport_final_2011April27.pd

USURPING AND UNCLEAN HANDS{tc "UNCLEAN HANDS"} AND ANTI-TRUST

VIOLATIONS:{tc "ANTI-TRUST VIOLATIONS"}

Defendants' monopolistic behavior is a violations of the

law, as stated, supra, there is a great distinction between

protecting one's legal right and using street brawling tactics.

Such behavior demands that the Defendant pay punitive

damages for its behavior.

BALANCING OF THE FACTORS:

Plaintiff believes that this is the most significant

consideration.  Many Courts use similar balancing factors.  The

Court in, Alliant Techsystems, ibid, commented on likelihood of

confusion,  . . . "whether a likelihood of confusion exists? If

the court determines that the Defendant's Trademark is not

understood by consumers to designate the source of the

Defendant's products or services, the court will dismiss the

suit. "Source" is to denote the similarity between the

Defendant's Mark and the Plaintiff's Mark; the degree to which

the products [or services] compete with each other; the alleged

infringer's intent to pass off its goods [or services] as those

of the Defendant; incidents of actual confusion; and whether the

degree of purchaser care can eliminate any likelihood of

confusion which would otherwise exist."  An actual

controversy has arisen and now exists between THE O-

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 107

MEGA NETWORK, INC. and Defendant, in that the Defendant contends that THE O-MEGA NETWORK, INC.'S registration and use of THE O-MEGA NETWORK, INC.'S Mark, which include the word "Ω-MEGA", dilutes the Defendant's Marks.

**DECLARATORY JUDGMENT — NON-DILUTION OF TRADEMARK:**

An actual controversy has arisen and now exists between THE O-MEGA NETWORK, INC. and Defendant, in that the Defendant contends that THE O-MEGA NETWORK, INC.'S registration and use of THE O-MEGA NETWORK, INC.'S Marks, which include the word "Ω-MEGA", dilute the Defendant's Marks.

THE O-MEGA NETWORK, INC. desires a judicial determination and declaration that THE O-MEGA NETWORK, INC.'S registration and use of THE O-MEGA NETWORK, INC. Mark do not infringe or dilute any valid Trademark of Defendant, or otherwise violate any of Defendant's rights.  Such a declaration is necessary and appropriate at this time so that THE O-MEGA NETWORK, INC. may ascertain its rights with respect to registration and use of THE O-MEGA NETWORK, INC.'S Mark.

**CLAIMS FOR RELIEF:**

This is a declaratory judgment action under the Trademark Act of the United States, 15 USC § 1051 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

As an actual justiciable controversy exists, THE O-MEGA NETWORK, INC. desires a judicial determination and declaration that THE O-MEGA NETWORK, INC.'S registration and use of THE O-MEGA NETWORK, INC. Mark is not likely to cause confusion with any of the Defendant's Marks and do not infringe on any valid Trademark rights of the Defendant, or otherwise violate any of Defendant's rights.  Such declaration is necessary and appropriates at this time so that THE O-MEGA NETWORK, INC. may ascertain its rights with respect to the registration and use of THE O-MEGA NETWORK, INC.'S Mark.

Claims for attorney's fees, costs and other damages: Plaintiff requests damages, for attorney fees and costs under any sanctions theories:

28 USCA § 1912: The court may impose sanctions against a party, its counsel or both where a judgment is affirmed. Additionally, the court, in its discretion, "may adjudge to the prevailing party just damages for his delay, and single or double costs." 28 USCA § 1912 (emphasis added); FRAP Rule 46, Cir. Adv. Comm. Note to Rule 46-2(2).

Federal courts have inherent power to impose sanctions for "bad faith" conduct in litigation or

for "willful disobedience" of a court order against the party, its counsel or the person or entity who controls the litigation and who is responsible for the abusive conduct. Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S.Ct. 2123, 2133 (1991); FRAP Rule 46, Cir. Adv. Comm. Note to Rule 46-2(8).

PRAYER FOR RELIEF:

THE O-MEGA NETWORK, INC., Plaintiff, realleges and incorporates by reference, as if fully set forth herein, the allegations in all the preceding paragraphs.

WHEREFORE, THE O-MEGA NETWORK, INC. prays for judgment against Defendants according to the declaratory relief sought, as follows:

1. As an actual justiciable controversy exists by way of the Defendant filing and serving "Opposition" litigation and demand to deny Plaintiff's registration of its Mark. Plaintiff seeks relief from this Court;

2. For a Declaratory Judgment that THE O-MEGA NETWORK, INC.'S registration and use of THE O-MEGA NETWORK, INC.'S Mark is not likely to cause confusion with any of the Defendant's Marks; that Plaintiff's goods are not confusingly similar to Defendant's goods nor does it infringe on any valid Trademark right of Defendants, or otherwise violate any of

Defendants' rights;

3. For a Declaratory Judgment that THE O-MEGA NETWORK, INC.'S registration and use of THE O-MEGA NETWORK, INC.'S Mark does not dilute any valid Trademark of Defendant or otherwise violate any of Defendants' rights;

4.  For an order declaring that THE O-MEGA NETWORK, INC. is not diminishing the value of Defendant's products;

5.  Plaintiff requests an order declaring that it did not Infringe on Defendant's Trademarks; or with any common law rights of Defendant.

6. For reasonable attorneys' fees of $75,000.00 or more, to the extent authorized by law; 6. For reasonable attorneys' fees of $175,000.00 or more, to the extent authorized by law;

7. Award THE O-MEGA NETWORK, INC. its costs in this action, costs of suit; and

8. For such other and further relief as the Court deems just and proper;

9.  For an order declaring that the alleged violations of Trademark, asserted by the Defendant, are dismissed, and Plaintiff may Register its Mark in the principal register.

10.  For an order declaring that the defendant is in violation of Anti-Trust Laws;

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF          Page 111

11.  For Punitive damages: in a sufficient amount to deter Trademark Bullying; and is commensurate with Defendant's economic size. In the amount of $75,000.00 or more.  **In the amount of $175,000.00 or more.** The Court may also wish to consider that Defendant has filed numerous oppositions to others wishing to register their mark.

12.  For an order declaring that the Defendant acted in bad faith and base conduct; and for damages of $275,000.00, or more, therefrom;

13.  DEMAND FOR JURY TRIAL, Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, THE O-MEGA NETWORK, INC. hereby demands a jury trial on all triable issues.

Respectfully submitted,

OCTOBER 19, 2018

/s/ szanerothschild
S. ZANE ROTHSCHILD, ESQ.
Attorneys for Plaintiff
THE O-MEGA NETWORK, INC.
zane@zane-law.com
310-837-0801


Plaintiff's EXHIBIT No. 1


Plaintiff's EXHIBIT No. 2

**Verification   Case No. 2:18-CV-04968-JAK-KS**

I, ELAN ROTHSCHILD, declare as follows:

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF     Page 112

I am the CEO of Plaintiff Corporation, THE O-MEGA NETWORK, INC., in the present case.  I am a citizen of the United States of America. I am eligible to vote in an election for the office of the President of the United States.

I have personal knowledge of myself, and my activities; and Plaintiff, THE O-MEGA NETWORK, INC. its activities, and intentions, including those set out in the foregoing VERIFIED SECOND AMENDED COMPLAINT for Declaratory Relief; and if called on to testify, I would competently testify as to the matters stated herein.

I do hereby declare and verify under penalty of perjury, under the laws of the United States of America, that I have read the foregoing  complaint, and know the contents thereof, and the factual statements contained therein, concerning myself, my activities, and the activities of THE O-MEGA NETWORK, INC., and they are true and correct, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

December 12, 2018

_____
ELAN ROTHSCHILD
CEO, THE O-MEGA NETWORK, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28